The judgment of the District Court so modified is accordingly affirmed.

**HOCK, In Re: Neglected.**

Ohio Appeals, First District, Hamilton County.

No. 6893. Decided December 15, 1947.

74 

Taft, Stettinius & Hollister, Cincinnati, for petitioner, appellee

Carson Hoy, Pros. Atty., Thomas Stueve, Asst. Pros. Atty., Cincinnati.

Aaron T. Grad, Cincinnati, Fogle & Fogle, Marietta, for respondents-appellants.

**OPINION**

By ROSS, PJ.:

This is an appeal upon questions of law from a final judgment of the Court of Common Pleas of Hamilton County, Division of Domestic Relations. The notice of appeal was filed by "Pete Hock, a minor, by Pietro Muscari, his father and next friend, and Pietro Muscari and Jane Muscari, a minor, the latter by Pietro Muscari, her husband and next friend, respondents-appellants."

The judgment from which this appeal upon questions of law was taken is in the following terms:

"This day appeared in open Court Pete Hock, alleged by petition heretofore filed herein to be a neglected person, and the Court, after hearing the testimony and after full investigation and consideration, finds that the allegations of said petition are true and that the said Pete Hock, a boy, of the age of 1 year, on or about the 22nd day of July, 1946, is in fact neglected.

"It is therefore ordered and adjudged by the Court that the said Pete Hock be and he is hereby permanently committed to the care, custody, maintenance and control of The Children's Home, Cincinnati, O. and to any person or persons whom it may select in accordance with said act, to remain under the care and control of said The Children's Home, Cincinnati, O. and subject to its rules until he arrives at the age of twenty-one years, or until discharged by this Court or by due process of law.

"It is further ordered by the Court that the said Pete Hock shall be immediately placed in custody of Frederick A. Breyer to be by him conveyed to the said The Children's Home, Cincinnati, O. and that a commitment, in accordance with the judgment herein, be issued and delivered to the said Frederick A. Breyer to be by him returned and filed with this Court."

The entry embodying this judgment is a printed form, the spaces containing pen and ink insertions and even stamps.

This judgment was rendered at the termination of a hearing initiated by the filing of a petition, the body of which is in the following terms:

"Your petitioner, Duana W. Christy, a resident of said County, and a responsible person, respectfully represents unto your Honor that Pete Hock, a boy of the age of 1 year on or about the 22nd day of July, 1946, now within said County, is a neglected person, in this: that the said Pete Hock lacks proper parental care by reason of the faults and habits of his parent, and that the said Pete Hock is now in the custody of Duane Christy, Children's Home, Cincinnati, O.

"Your petitioner therefore prays this Honorable Court to inquire into the alleged neglect of said Pete Hock, and of the truth of the matter herein contained in pursuance of the statute in such case made and provided, and make such order in the premises as to this Honorable Court may seem meet and proper."

The petition is also in a printed form, with pen and ink insertions.

It will be noted that the petition charges the neglect of a parent, which is not stated.

No motion to dismiss this appeal has been filed, but it is suggested by the Prosecuting Attorney of Hamilton County, who orally and in his brief states he represents the trial court, that the foregoing judgment does not constitute a final order from which an appeal on questions of law may be taken to the Court of Appeals. The basis for this contention is the absence of language in §1639-51 GC. It is asserted that the General Assembly has failed to provide for an appeal upon questions of law from a judgment of the "Juvenile Court" in actions, such as the one herein involved.

In 1944, the Constitution of Ohio was amended, giving the General Assembly power to fix the jurisdiction of the Court of Appeals in the review of judgments of courts of record. The General Assembly has since the effective date of such constitutional amendment enacted no legislation affecting the jurisdiction of this Court in the review of the instant judgment. Such jurisdiction, therefore, must be predicated upon the jurisdiction of this Court under the Constitution prior to such amendment; the provision of the 1944 amendment to the Constitution being merely permissive, and such amendment retaining the jurisdiction in review as before existent. **Youngstown M. Ry. Co. v. Youngstown, 147 Oh St, 221.**

It is to be noted that after the 1912 amendment of **Art. IV, Section 6 of the Ohio Constitution,** prior to the enactment of the modification of the Appellate Code, (§12223-1, et seq.) effective January 1, 1936, the word "appeal" denoted, as far as the Court of Appeals was concerned, a trial de novo limited to the review of a chancery case, now under such amended procedure styled an appeal upon questions of law and fact. While what is now termed an appeal upon questions of law was effected by the filing of a petition in error.

The Supreme Court has often iterated the pronouncement that the jurisdiction of the Court of Appeals to review judgments of courts of record, whether upon petition in error or appeals on questions of law was fixed by the **constitution, Art. IV, Section 6,** and so, beyond the power of the legislature to increase or diminish. **State, ex rel. v. Wallace, 107 Oh St, 557.** See, also, **Werner v. Rowley, 129 Oh St, 15, 18.**

It is immaterial, therefore, whether the section of the General Code noted fails to give the Court of Appeals jurisdiction to review the instant judgment or not, and even if that

section, or some other section enacted before the effective date of the 1944 amendment of **Article IV, Section 6 of the Ohio Constitution,** had prohibited a review of such a judgment as is here considered, no impairment of the full jurisdiction to review such judgment under the provisions of **Article IV, Section 6** before amendment could have existed.

The judgment here considered is a final judgment of a court of record of the State of Ohio, and as such is subject to review by this Court upon questions of law. It is not subject to review upon questions of law and fact, simply because it is not a decree in a chancery case.

The contention of the Prosecuting Attorney contained in his suggestion that this Court has no jurisdiction to review the instant judgment upon questions of law must, therefore, fail. If such contention is to be considered as a motion to dismiss this appeal, it is overruled.

By the proceeding here under consideration, the "petitioner" seeks to have a judicial determination that the minor involved, a child one year old, is a neglected person, as defined in §1639-3 GC, which provides in part:

"For the purpose of this chapter the words 'neglected child' includes any child:

"1. Who is abandoned by its parents, guardian or custodian.

"2. Who lacks proper parental care by reason of the faults or habits of its parents, guardian or custodian."

The child in question is the son of the appellants, Pietro Muscari and Jane Muscari, husband and wife, legally married, with an established and fully adequate residence and home in the City of Marietta, in which the parents of the child live, in a present status beyond any criticism, under ideal conditions, and which home is maintained by the father of the child by virtue of a more than competent income which he receives from an employment as a highly skilled electronic engineer, both parents having experienced a more than usual education, the father holding degrees of Bachelor and Master of Science.

Now it appears from the "petition" that the particular specification mentioned in §1639-3 GC, upon which the charges against the **parent** are based is paragraph 2, for it is stated that the child in question "lacks proper parental care by reason of the faults or habits of its parents."

It clearly appears from the evidence, as has been stated, that the present status of this married couple in their home in Marietta is ideal.

It also clearly appears from the evidence that the petitioner has resorted to facts antedating the present status in an attempt to sustain his charges.

This whole matter might be disposed of with the brief conclusion that no such incident or fact now has any effect upon the status of these parents or in any way prevents their home from being an ideal place for this child to be reared, and that no fault or habit of either parent can now cause a lack of proper parental care. Deference to the trial court and counsel requires a more detailed statement of the facts, upon which such conclusion is based.

The father of the child was born June 24, 1904 in this Country, taken to Italy when one year of age, and returned here when aged 13 in 1917. By industry and self-denial, he secured a thorough education, both general and technical, permitting him to hold continuous responsible positions as an electronic engineer. He was married and had five children.

In 1944, the father fell in love with his present wife, the mother of the child here involved. As a result of the meretricious relationship of these parents the child in question was born July 22, 1945. Jane Muscari (nee Hock) the mother, was at that time almost seventeen years of age, having been born August 19, 1928. Pietro Muscari was 41 years of age.

No one, including these parents, attempts to justify the conduct of either.

It is apparent that the situation thus presented produced a most complicated problem for all those concerned. Obviously in view of the change in the affections of the father, his first wife was entitled to and did secure a divorce on June 19, 1945. Prior to filing of the petition for divorce the father signed over to his first wife all of his real property and then and continuously thereafter made provision for the education, maintenance, and support of his children. It appears from the evidence that some time prior to the birth of this child, Pietro and Jane, mistakingly seeing no other alternative available, decided to leave Marietta. After an absence of some weeks, however, they returned. The father of Jane sent her to Florida and then to Maple Knoll Home in Cincinnati, where she gave birth to the infant "Pete". The infant remained in the home and Jane was sent to Berkley, Michigan to complete her education.

Two things are apparent, the parents of this child earnestly desired to have it under their care, and the parents of Jane were determined to prevent this if possible. They refused to have it in their home and have steadily exerted themselves in an effort to prevent the father securing its custody.

While Jane was in Berkley, Michigan, Pietro, the father, sought to obtain custody of his child through a writ of habeas corpus. Jane resisted this action, claiming the child for herself, and Pietro was denied a writ. It appears that this strange action on the part of Jane was caused by information given her that Pietro had remarried. This information was false, but the effects of this false information was to produce a temporary estrangement between Pietro and Jane, which was dissipated immediately upon Jane's discovery of the truth. With this exception, the relationship of Pietro and Jane has been continuously characterized by affection and his regard. With this exception, they have continuously had one desire, to-wit: to have the joint custody, care, and love of their child. And even this instance of the habeas corpus proceeding indicates a separate desire for the care of the infant.

Another result of the false information given Jane was to cause her to sign a surrender of the child. This is not in evidence, and is admitted by all parties to be of no consequence, in that any authority or waiver represented by the instrument was later unequivocally revoked when Jane became advised of the truth as to Pietro. Jane and Pietro were married in Oakland, Maryland (a state not requiring waiver by parents of a minor) on April 26, 1947, established a home in Marietta, and have continued to reside there in perfect harmony. It appears that Jane is again to become a mother in the coming year.

The parents of the infant Pete requested The Children's Home to give them custody of their child, tendering the sum of $600.00 to cover the cost of its care in that institution. Their request was refused and the money returned, upon the basis of the surrender executed by Jane, although previously revoked in a letter to the home. The parents were also notified that the baby had been placed in an adoptive home.

The conflicting interests centering about this child thus became apparent. Through the technicality of this proceeding appears the contest of foster parents versus actual, natural parents.

Whether this situation be considered from such technical viewpoint or from a position dictated by considerations of humanity, or again from the standpoint of the best interests of the child, which in truth is the essential consideration, it seems that the claim of the natural parents should prevail. This conclusion is contrary to the finding of the trial court which, however, must be sustained, if it is to stand, by evidence

indicating that **now,** by reason of "faults or habits" these natural parents should not have their own child. It is the present status of these parents that is under consideration.

It has been suggested that if these parents are not fit to have the child, the subject of this proceeding, then their child to be born in the coming year, and all other children born to them, should be instantly taken away for the same reason. At first this suggestion bears the ear marks of absurdity, and yet, upon mature consideration, why is it not a fair statement? If because of their past dereliction, now wholly dissipated by a status recognized by society as legal and proper they may not have this child, why should they **ever** be permitted to retain the custody of their children?

What of the child? That its foster parents—when a legal adoption is permitted * (no adoption proceeding having been yet accomplished) may give the child a good home and properly rear it, may be admitted. Either home for the next few years would make little difference in the child's welfare. But what of the future?

Sooner or later the child will know that it is an adopted child, and even if that knowledge is gained in later years, it can never occupy the **same** status or have the **same** comfortable feeling of normalcy which is enjoyed by those children who grow up to adult age in the home of their own parents.

By the judgment of the trial court, a permanent continuing stigma has been placed upon its parents. It is a matter of fair speculation, whether or not when this child reaches adult age and become aware of **all** the facts, it will be grateful to any court which has so stigmatized **its** parents and removed it from natural love and affection which it would have received had it been permitted to go to them upon their request made at the earliest moment they were permitted to offer it a suitable home.

The natural parents of any child have a predominant right to its custody and care, which can only be abrogated when it clearly appears that they have forfeited that right by conduct which will impair the present and future welfare of their child. It cannot be supposed that the General Assembly intended by its enactment of §1639-3 **GC,** to decree otherwise.

A human life is the subject of consideration here, not merely the temporary custody of a baby. What is done in this proceeding permanently affects the whole course of such human life. A grave and serious step in the course of that life is here taken not lightly to be accomplished by the use of printed forms, or hasty routine.

This is not a proceeding in which punishment is to be meted to the adult parents for a grave dereliction of social obligation.

This child is to be placed in its normal environment under the continued care of its natural parents, or it is to be separated therefrom, and by the irrevocable decree of a court of justice, presented as a gift to those who though capable and able to furnish it home and education, still now and always will be but foster parents, with all the limitation such title connotes.

It is difficult to conceive of any justiciable subject upon which courts may be required to pass which assumes the grave importance incident to the determination of what shall be the environment of a human life, especially when such determination is made shortly after such life has come into existence. The decree of disposition may result in a happy life of service, or it may be permanently calamitous in its effect upon all concerned. The function of adjudication of the issues thus involved places a heavy burden upon the tribunals appointed to effect their determination.

It is the conclusion of this Court that there is no evidence in the record sustaining a finding that the parents of this child are not fit and suitable to be its natural guardians and custodians, or that any fault of which they might have been guilty in the past has present efficacy to cause their child to be the subject of legal neglect, as defined by the statutes of this state.

The petition should have been dismissed by the trial court for such complete failure of proof, and the judgment which the trial court should have rendered is now rendered by this court and the petition is dismissed.

ROSS and HILDEBRANT, JJ, concur in syllabus, opinion & judgment.

MATTHEWS, PJ, concurs in syllabus & judgment.