## In re Brenda H.

[Cite as In re Brenda H. (1973), 37 Ohio Misc. 123.]

(Nos. 281077 and 283356—Decided March 19, 1973.)

Common Pleas Court of Cuyahoga County, Juvenile Court Division.

*Mr. John D. Ryan*, for the putative Father, Clifford D.
*Ms. Joyce E. Barrett*, for the Mother, Carol H.

WHITLATCH, J. This matter originally came before the court upon an application for the custody of Brenda H.

filed by her putative father, Clifford D. In a bastardy action in this court, Clifford originally denied paternity but subsequently changed his plea to guilty and was adjudged the reputed father of Brenda on 12/30/68.

This is one of several cases that has been brought in this court under R. C. 2151.23(A)(2), wherein the putative father has predicated his right to custody of his illegitimate child under the authority of *Stanley* v. *Illinois* (1972), 405 U. S. 645, 92 S. Ct. 1208. Holding that the father of an illegitimate child is entitled to a hearing in an adoption case and in dependency and neglect proceedings, *Stanley* has caused much consternation among child welfare and adoption agencies and has given currency to the proposition that the right of the father to the custody of his illegitimate child has been greatly enlarged.

*Stanley*, on its facts, is similar to many of the reported cases wherein the rights of the father of an illegitimate child have been given recognition. In these cases the unwed mother and the natural father of the illegitimate child had lived together with the child, thus establishing a *parental* relationship between the child and the father, rather than merely a biological relationship which is generally the case. *In re Aronson* (1953), 263 Wisc. 604, 58 N. W. 2d 553; *In re Mark T.* (1967), 8 Mich. App. 122, 154 N. W. 2d 27; *Vanderlaan* v. *Vanderlaan* (1972), 405 U. S. 1051, 92 S. Ct. 1488 (see 126 Ill. App. 2d 410, 262 N. E. 2d 717, for facts and opinion in this case).

In *Stanley* the father lived with the mother intermittently for 18 years and had three children by her. Under these circumstances, we agree with Mr. Justice White, when he says: ''The private interest here, that of a man in the children he has sired and *raised,* undeniably warrants deference and, absent a powerful countervailing interest, protection.'' (Our emphasis.) The child in the instant case, like the overwhelming majority of illegitimate children, has been ''*raised*'' by her mother, Carol H. Carol has had some grudging help from her mother's family and some financial assistance from Clifford as required by the order of this court in the bastardy proceeding.

While we recognize that at common law a putative father of an illegitimate child has, in general, the right to custody of such child against all but the mother, we know of no law which puts the putative father on an equal basis with the mother as to custody and we do not believe that *Stanley* establishes such parity. It is definitely established that "the mother, if a suitable person, is the natural guardian of' * * * [an illegitimate] child and, as such, has a legal right to its custody, care, and control superior to that of the father or any other person, unless it is otherwise expressly provided by statute." 10 American Jurisprudence 2d 889, Section 60; annotation 98 A. L. R. 2d 417. We are of the opinion that the mother cannot be deprived of this "superior" right of custody simply by the exercise of the court's discretion upon an application for custody under R. C. 2151.23(A)(2).

The instant case does not present the same situation as the determination of the custody of a legitimate child. Under R. C. 2111.08 "(T)he wife and husband are the joint natural guardians of their minor children * * *." When living separate and apart or are divorced, and the question as to the custody of their children is brought before a court, it is provided by R. C. 3109.03 that the husband and wife shall "stand upon an equality as to the care, custody, and control of such offspring, so far as parenthood is involved."

R. C. 3109.04 provides that upon hearing the court shall decide which of the parents shall have custody of the offspring taking into account that which would be in the best interests of the children. Thus as between husband and wife living separate and apart or divorced the court in the exercise of its sound discretion decides which of the parents shall have custody of the children. In our opinion this court has no such discretion in a contest between the putative father and the mother of an illegitimate child for the simple reason that the mother has a right of custody that is *superior* to that of the putative father. Nothing in *Stanley* v. *Illinois, supra,* has affected this right.

The mother of an illegitimate child can lose her right

to custody only by abandonment (*Clark* v. *Bayer* [1877], 32 Ohio St. 299, *In re Tilton* [1954], 161 Ohio St. 571), by contract as provided in R. C. 5103.15 and 5103.16, by two years willful failure to support, R. C. 3107.06(B)(4), or by the child coming within the jurisdiction of the Juvenile Court, as provided in R. C. Chapter 2151 where custody of an illegitimate child is the primary issue, and the child must come within the purview of R. C. 2151.03 as a neglected child, or R. C. 2151.04,, as a dependent child.

While in this cause the child at time of the application was in the home of the putative father, having been placed there by Carol's mother, there is no suggestion that Carol either expressly or by implication entered into any contract with Clifford giving him the custody of her child. It being the contention of counsel that Carol has failed to give Brenda proper care, at the court's suggestion a neglect complaint was filed under R. C. 2151.03. The court indicated that if the complaint were sustained and Brenda adjudged a neglected child, the court would then take Clifford D's application for custody under consideration as a part of the dispositional process in the neglect case.

The evidence showed that Carol had lived with and cared for her child either at her mother's home or in her own residence for all but six or seven months of her child's life and that during this separation Carol visited the child regularly and contributed financially to her support. Carol has been regularly employed as a clerk and cashier most of the time since July of 1969. She gave birth to a second illegitimate child in November, 1971, which she placed for adoption. She has no history of arrests and does not drink or use drugs. Carol and Brenda returned to Carol's mother's home in December of 1971. In June of 1972 Carol's mother ordered her to leave the home and she did so, leaving Brenda with her mother; shortly thereafter Carol's mother placed Brenda in the home of Clifford.

It was clear that the difficulties between Carol and her parents that led to their banishing her from their home and their subsequently placing Brenda with Clifford was their complete disapproval of the young man with whom Carol

was keeping company and whom she later married. The young man was a high school graduate, regularly employed, and well mannered, but entirely unacceptable to Carol's family because he was black. The court is completely persuaded that had Carol married a white man there would have been no rallying point for Clifford and Carol's parents and this action for custody would never have been initiated.

Counsel for Clifford does not urge Carol's miscegenetic marriage as a reason for depriving her of the custody of Brenda. Indeed, this issue has not been raised directly by Clifford's counsel either in his pleadings or in his presentation of the evidence. Counsel for Carol has pointedly suggested, however, that, while unavowed, Carol's marriage to a black man is the overriding motivation for bringing the custody action.

The court could dispose of this matter without reference to the bi-racial marriage. However, the obviousness of the issue and its underlying pervasiveness in the entire proceeding lead the court to the conclusion that this issue should be squarely faced and unequivocally resolved.

Race relations in the United States has long been one of our most turbulent and troublesome problems. In the past two decades much progress has been made in the direction of giving racial minorities the protection and rights that are avowedly guaranteed to all persons under our laws and constitutions. We still have a long way to go if both the spirit and the letter of our laws are to be applied equally and with even impartiality to all our citizens, regardless of race.

The only reported Ohio case relating to race as affecting the custody of children is *In re Adoption of Baker* (1962), 117 Ohio App. 26, 185 N. E. 2d 51. The child was of English and Puerto Rican ancestry, was illegitimate and had been permanently surrendered to an adoption agency by its mother. The agency placed the child for adoption in a home where the wife was white American and the husband Japanese. In denying the petition to adopt, the Probate Court emphasized the import of R. C. 3107.-05(E) which requires taking into account the "racial * * *

and cultural backgrounds'' of the child and the petitioners. In reversing the Probate Court's denial of the adoption the Court of Appeals said that under ordinary circumstances the child should be placed into a family ''having the same racial, religious and cultural backgrounds,'' but because of the special circumstance the best interests of the child transcended the racial and cultural consideration in that particular case. While the criteria for adoption, a planned and statutorily regulated child placement, is clearly distinguishable from the criteria for choosing a child's custodian as between natural parents, it is of more than passing interest that today it is not uncommon for a child to be adopted by persons of racial origin different from that of the child.

It should be an elementary and well accepted proposition that no court can by its processes regulate the internal affairs of the home when the matter complained of does not involve anything immoral or harmful to the child. *People, ex rel. Sisson,* v. *Sisson* (1936), 271 N. Y. 285, 2 N. E. 2d 660. However, in respect to race this proposition has moved at a slow pace in gaining acceptance.

It was not until 1967, that the United States Supreme Court struck down criminal anti-miscegenation laws. *Loving* v. *Virginia* (1967), 388 U. S. 1, 87 S. Ct. 1817. In doing so the court used the following language: ''The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry, or not to marry, a person of another race resides with the individual and cannot be infringed by the state.'' If the court in the case at bar would hold that Carol by her interracial marriage had forfeited the custody of her child we would indeed be infringing upon the right to marry a person of another race.

Of interest for trial courts' evasive, gingerly approach to the problem of race as affecting custody are *Stingley* v. *Wesch* (1966), 77 Ill. App. 2d 472, 222 N. E. 2d 505 and *People, ex rel. Portnoy,* v. *Strasser* (1952), 303 N. Y. 539, 104 N. E. 2d 895. In *Stingley* when the divorced mother had married a black man, the trial court gave cus-

tody to the father for "social and economic" reasons. Likewise, in *People* v. *Strasser*, where the divorced mother married a black man, the trial court awarded custody of her child by her first husband to the grandparents for the only evidentiary supported reason that the mother placed the child in a day nursery while she was employed. In both cases the reviewing court reversed and returned custody to the mother, holding in *Stingley* that race of the stepfather was of no significance, and in *Strasser* that there was no neglect of the child and that the court would not "interfere in the internal arrangements of family life." See, annotation, 57 A. L. R. 2d 678 for an article on race as affecting custody.

It is accepted as a truism that there is a relatively higher success correlation in marriages where the parties have the same racial, religious and cultural backgrounds. Priests, rabbis and ministers preach and labor assiduously to promote religious homogeneity in the marriage of their respective adherents. Ethnically centered parents breathe easier when their offspring marries "one of their own." The believed to be trump card of the white racial segregationist is: "Would you want your daughter to marry a black man?"

Despite the acceptance of this truism, we know of no statistical survey that would prove that "homogenous" marriages have a better chance of survival than do "mixed" marriages. However, we are sure that divorce records will show that homogeneity is far from being a guarantee of a successful marriage. It well may be that individuals who enter into a bi-racial or bi-religious marriage, aware of the problems they will encounter and with a resolution to solve such problems, have as good or perhaps a better chance of a successul marriage than if they had married a person of a like religion or race.

Irrespective of the chances for success or failure of bi-racial or other "mixed" marriages and in spite of abounding prejudice of all kinds (racial, ethnical and religious) the American "melting pot" will continue to bring about the marital union of persons of different racial, religious

and cultural backgrounds. The law wisely does not and should not interfere with this process.

Certainly then Carol's marriage to a black man is of no significance in this case and does not support the neglect complaint.

It is arguable that there have been brief periods in the past when Carol failed to give Brenda proper parental care and Carol has given birth to a second illegitimate child. However for the past one and one-half years Carol has functioned as a responsible adult and now has a satisfactory home and a husband who is regularly employed. As was said in *In re Hock* (1947), 55 Ohio Law Abs. 73, before a child may be adjudged neglected the evidence must show that any fault of the parent occurring in the past is, at the time of the hearing, effective to render such parent unfit and unsuitable to have the custody of the child and that by reason of such fault the parent is incapable of extending proper parental care.

The neglect complaint has not been sustained by clear and convincing evidence as required by Rule 29(E)(4) of the Juvenile Rules.

Holding as we have above that the mother of an illegitimate child has a legal right to the child's custody superior to that of the father, absent a showing that the mother has forfeited her superior right of custody the Court is without authority to entertain Clifford's application for custody under R. C. 2151.23(A)(2). The Court therefore declines to receive any evidence as to Clifford's fitness to have custody of the child. Upon the authority of *In re Torok* (1954), 161 Ohio St. 585, Carol's oral motion for custody is granted and Clifford is ordered to return Brenda to her care.