In re Wright et al.

(No. 321094—Decided April 21, 1977.)

Court of Common Pleas of Cuyahoga County, Juvenile Court Division.

*Mr. Joseph Blackwell,* for relator-mother.
*Mr. John Benning,* for respondent-father.

HARRIS, J. Charlene Gilmore is the natural mother of twin daughters, Jamie Lee Wright and Janie Lee Wright, now aged four months. She filed a complaint requesting a writ of habeas corpus claiming that her twin daughters are being unlawfully detained and restrained of their liberty by their father.

Harvey Wright, the father, was so adjudicated, by admission, in a prior proceeding before this court. He filed an answer to the complaint for writ of habeas corpus and a cross-complaint for custody.

Hereinafter, the parties shall be referred to as "relator-mother" and "respondent-father" for purposes of clar-

ity. The statute under which this action was filed provides for the filing of a "complaint" requesting a writ of habeas corpus.

The relationship between relator-mother and respondent-father spans a five year period. Respondent-father claims that he has lived with the relator-mother for approximately five years. And that after the birth of said twins, he and petitioner exercised joint care, custody and control.

While also claiming that their relationship has intermittently lasted for five years, relator-mother emphatically denies that there was effected a common law marriage between them and maintains that no such marriage was ever intended. The evidence is clear that a common law marriage was not effected between the parties principally because there was no agreement *in praesenti*.

Medical records were introduced by respondent-father without objection by relator-mother. The records revealed and relator-mother admitted in court that she had used cocaine prior to her delivery of subject children. At birth, urine tests on both infants showed traces of morphine and cocaine. A final diagnosis of both newborn infants was that each was addicted to narcotics at birth.

The testimony also indicates that relator-mother has used drugs subsequent to the birth of her children. Throughout her drug-use experience, respondent has either supplied, procured or aided her in the procurement of drugs.

Respondent-father has taken sole care, custody and control and removed the children to an abode where he now resides with a former wife and sister-in-law and several of his children by this former union.

Relator-mother claimed this removal was occasioned by the use, and threat of the use of force and violence. Respondent-father denied this and claimed that such removal was occasioned because of petitioners abandonment and neglect.

Whatever the circumstances, it is clear that respondent-father's decision to exercise sole custody was made unilaterally, without relator-mother's consent.

At the time of the hearing, the youngest child, Jamie Lee Wright, was hospitalized because of congenital abnormalities and complications. Her condition requires highly specialized treatment which will continue well into the foreseeable future.

In accordance with Juv. R. 32(D), an investigation was made of the relator-mother and the respondent-father and their respective abodes and facilities for caring for subject children.

### Issues.

Several issues of grave and profound import loom upon the horizon of these facts. They are gleaned as follows:

1. Can a writ of habeas corpus proceeding be expanded into a custody hearing by the filing of an answer and cross-complaint?

2. Is there a distinction between a "putative" father and a father adjudicated by admission?

3. Does an admitted and adjudicated father have legal standing to seek custody of his illegitimate child against the mother and if so, what are the confines and/or parameters of such standing?

4. Would custody in the mother be in the best interest of subject children; or would custody in the father be in the best interest of subject children?

5. Are subject children neglected or dependent?

*Can a Habeas Corpus Writ Proceeding Be Expanded by Filing an Answer and Cross-Complaint for Custody?*

As respondent-father has filed an answer and cross-complaint, the first immediate question is whether custody can be adjudicated in this habeas corpus proceeding. Must a separate action be brought to consider the further needs of the child?

In *Baker* v. *Rose* (C. P. 1970), 270 N. E. 2d 678, it was held that since R. C. 2151.23(A)(3) confers upon the Juvenile Court exclusive jurisdiction to hear and determine applications for writs of habeas corpus involving child custody, it (Juvenile Court) is empowered to adjudicate fully as to the needs of the child involved. Juv. R. 10(A)

specifically provides that "Any person may file a complaint to have determined the custody of a child * * * and any person entitled to the custody of a child and unlawfully deprived of such custody may file a complaint requesting a writ of habeas corpus * * *."

Therefore, by statute, the exclusive jurisdiction of Juvenile Court is explicitly well defined as to writs of habeas corpus involving the custody of a child.

*Baker* v. *Rose* held that where Juvenile Court assumes jurisdiction in habeas corpus proceedings, it may exercise such further necessary powers to resolve all other ancillary issues, and may retain jurisdiction to make further orders although the petition for writ of habeas corpus is denied.

The major reasoning for this position is perfectly clear. In order to avoid unnecessary duplicity of litigation, the court, when having all the necessary parties before it in a habeas corpus proceeding, can deal immediately with all of the same issues and parties that would be before it in a subsequent separate custody filing. All courts either are docket conscious or quickly becoming so because of the constant press of ever increasing filings.

This court is also aware of pressures and is daily aware of its ever increasing docket. Therefore, in that both statute and case law supports the expansion habeas corpus proceedings to consider the full needs of a child, the court so finds and shall consider the matter of custody as raised by defendant's cross-petition.

*Is There a Distinction between a "Putative" Father and a Father Who by Admission Has Been Adjudicated as Such According to Law?*

This is an area of the law that now is full of sound and fury signifying change.

Historically, whether in fiefdom or on the plantation, one of the most cherished privileges of males of the upper socio-economic classes has been the time honored pastime of "wenching."

The participants in this sport have traditionally been protected by both the common law and statute law. In

essence, the law has traditionally denigrated the mother of an illegitimate child; branded and banished the child from any claim of birthrights from and through the father including name and fortune. The pattern is woven throughout recorded history from ancient Rome to Kent to South Africa to Natchez.

In preserving and protecting this practice for men of the upper socio-economic classes, the law also fostered and indeed encouraged bastardy among the poor. Recent reexamination of this question tends to recognize the inequities as well as social detriment caused such legal treatment of children born out of wedlock.

Stephen H. Marcus commenting on the question in an article entitled, *Equal Protection: The Custody of the Illegitimate Child*, 11 Journal of Family Law 1 (1971), sets forth this change of attitudes at pages 47-48, as follows:

"I submit that the state would benefit much more by giving recognition to *de facto* child-parent relationships without requiring formal marriage between the parents of the child. Family privacy and integrity should be recognized and protected where it actually exists, not only where there has been legal marriage. * * * This would seem to be the very least that the United States Constitution would require in giving the illegitimate child an opportunity to have a meaningful relationship with his natural father. The child's interest, and therefore the state's, can be better promoted by modelling bastardy laws after those of Arizona, which recognize the putative father's interest in his child if his paternity is acknowledged or judicially determined and treat the illegitimate child as it would be the legitimate child in similar circumstances. * * *

"* * * the putative father should be given the opportunity to present his plan, not for his benefit, but for the child's. The best interests of the child, rather than assorted notions of the mother's right, the sanctity of marriage, punishment of immoral conduct, should determine who receives custody of the child."

In a related article, *Parental Rights in the Illegitimate Child: Some Legitimate Complaints on Behalf of the Un-*

*wed Father*, 11 Journal of Family Law 231 (1971), Norman G. Tabler, Jr., at pages 252, 254, states:

"* * * the classification [between legitimate and illegitimate children] is based on the past legal relationship between the father and the mother, while the real issue centers wholly on the relationship of the father to his child." "If the rights and duties of parenthood are truly coextensive, then it is arguable that the father who is required by the state to honor his parental duties, and who does so, should have the corresponding parental rights. Since society has recognized his parental obligations, there ought to be a recognition of his corresponding rights. There is no readily apparent reason why society should not allow a concerned and responsible father to have at least the opportunity to make his case."

Both these commentaries were frontal attacks against statutes common throughout the country that substantially disenfranchised the "putative" father in order to protect him from his bastard children and their mother.

For example, *In re Brennan* (Minn. 1965), 134 N. W. 2d 126, represented the epitome of this attitude when the case pointed out that the most fathers of illegitimate children do not seek their custody and the few that do pose a threat to the orderly adoption processes and prospective adoptive parents.

However, this position is now under seige through the entire country and the spearhead of that attack is *Stanley* v. *Illinois* (1972), 405 U. S. 645.

In the *Stanley* case, an unmarried couple had lived together for 18 years and had three children. When the mother died, the children were declared wards of the court and placed with guardians, under an Illinois statutory scheme which declares the children of unwed fathers to be dependents, upon the death of the mother, without any hearing on parental fitness and without proof of neglect.

The Illinois Supreme Court rejected the claim of the father, Peter Stanley, that this statutory scheme was violative of equal protection, holding that the petitioner could properly be separated from his children upon mere proof

that he and the dead mother had not been married and that Stanley's fitness as a father was irrelevant.

Stanley appealed to the United States Supreme Court, which stated the issue as follows:

"We granted certiorari * * * to determine whether this method of procedure by presumption could be allowed to stand in light of the fact that Illinois allows married fathers—whether divorced, widowed, or separated—and mothers—even if unwed—the benefit of the presumption that they are fit to raise their children."

The court ruled that "Stanley's interest in retaining custody of his children is cognizable and substantial," and the presumption that an unwed father is an unfit person denied him equal protection.

See, also, *Rothstein* v. *Lutheran Social Services* (1972), 405 U. S. 1051; *E* v. *T* (1973), 124 N. J. Sup. 535, 308 A. 2d 41; *Forestiere* v. *Doyle* (1973), 30 Conn. Sup. 284, 310 A. 2d 607 (distinguishes putative from natural admitted father); *Slawek* v. *Convenant Children's Home* (1972), 52 Ill. 2d 20, 284 N. E. 2d 291; *In re Guardianship of Harp* (1972), 6 Wash. App. 701, 495 P. 2d 1059; *Doe* v. *Dept. of Social Services* (1972), 71 Misc. 2d 666, 337 N. Y. Supp. 2d 102; *Gomez* v. *Perez* (1973), 409 U. S. 535, 93 S. Ct. 872; *Ross* v. *Ross* (1973), 126 N. J. Sup. 394, 314 A. 2d 623; and *In re Brenda H.* (C. P. 1973), 305 N. E. 2d 815.

The *Brenda H.* case arose out of this very Juvenile Court. Therein, an admitted father who had paid support to his illegitimate daughter gained physical custody after the mother contracted an interracial marriage. He petitioned the court for legal custody basing his claim upon *Stanley, supra.*

The case distinguished itself from *Stanley* and held in essence, at page 816, as follows:

"While we recognize that at common law a putative father of an illegitimate child has, in general, the right to custody of such child against all but the mother, we know of no law which puts the *putative father* on an equal basis with the mother as to custody and we do not believe that

*Stanley* establishes such parity * * *." (Emphasis added.)

In addition, the court further held that in absence of a finding of neglect or abandonment, the mother has a superior right to the custody of an illegitimate child.

Bouvier's Law Dictionary defines "putative father" as being the reputed father and indicates that this term is usually applied to the father of a bastard child.

It is further interesting that, by statute, Ohio has moved towards providing a vehicle by which a "natural" father may legitimate his illegitimate child. See R. C. 2105.18, the pertinent part of which is cited as follows:

"The natural father of a child may file an application in the Probate Court in the county in which he resides, in the county in which the child resides, or in the county in which the child was born, acknowledging that the child is his, and upon consent of the mother * * *."

The Probate Court, if satisfied that the applicant is the natural father, and that establishment of that relationship is for the best interest of the child, it (the Probate Court) shall enter the finding of fact upon its journal, and thereafter, the child is the child of the applicant, as though born to him in lawful wedlock.

An interesting case on this question is *E* v. *T, supra* (124 N. J. Sup. 535, 308 A. 2d 41). In that case, an unmarried couple had two children, who had lived most of their lives with their natural father and his wife in New Jersey. The natural mother, also married and living in Nevada, removed the children to Nevada through subterfuge.

A New Jersey Court ordered the mother to return the children immediately. She challenged the order on several grounds including a statute that gave exclusive right of custody and control of an illegitimate child to the mother. The putative father was given no right without express consent of the mother.

The New Jersey Superior Court, Chancery Division, held that such a distinction was violative of due process and equal protection of the law. It went further to hold that,

"Plaintiff-father is not the 'putative' father of the

children in question, but is the admitted natural father. * * * [A previous decision] distinguish[ed] between 'putative father' * * * and natural father, the former being one who is accused, alleged, or reputed to be the father of an illegitimate child whereas the latter is one who admits paternity or has been adjudicated same * * *."

This court finds this distinction not only wise and equitable, but also linguistically and etymologically correct.

As Ohio has seen fit to provide a method under R. C. 2105.18 by which a putative father can legitimate his illegitimate child through the Probate Court, wherein the "putative father" and natural mother admit and declare paternity; should such an essentially comparable admission and declaration a "putative father" charged by a mother under the bastardy statute (R. C. 3111.01) be given any less import?

This court believes not. All the essential elemental requirements of R. C. 2105.18 are present in a situation wherein a "putative" father is charged with bastardy under R. C. 3111.01 and upon being properly advised of his rights and consequences, admits such paternity.

To hold otherwise would be discriminatory against a bastard whose admitting father legitimates him under R. C. 2105.18 and one whose admitting father would do so if he were aware of it.

Therefore, this court holds that there is both a legal as well as an etymological distinction between a "putative" father and a father who has admitted such paternity under R. C. 2105.18 (legitimation) or R. C. 3111.01 (bastardy). Either of the latter are "natural" fathers of their children born out of wed-lock.

In the instant case, the defendant, Harvey James Wright, was adjudicated the father of subject children, Janie Lee Wright and Jamie Lee Wright, by admission, under this court's case No. 321129, and that he is thereby their "natural" and not their "putative" father.

*Does an Admitted, Adjudicated Father Have Legal Standing to Seek Custody of His Child against the Mother?*

Of course, the milestone case on this subject is *Stanley*

v. *Illinois, supra,* wherein the Supreme Court held that the presumption of an unwed father's unfitness denied him equal protection of the law.

The famous Ohio case on this question, *In re Brenda H., supra,* qualified *Stanley* v. *Illinois* to the effect that it did not put the putative father on an equal basis with the mother as to custody and that *Stanley* did not establish such parity.

However, upon long and sober reflection, it is now evident that *In re Brenda H.* bears one serious flaw. Brenda's father was an admitted, adjudicated father. He was thereby uncontrovertedly her father according to law and the mother's own declarations. Reference to him as the "putative" father was, at least, etymologically in error and, at most, legally in error.

Admittedly, under the fact situation *In re Brenda H.,* this flaw was not material as it would not have changed the end result. However, such a reference and designation of "putative" father under those circumstances has aided in fostering and maintaining this erroneous distinction.

In the instant case, there has been neither a finding of neglect nor abandonment prior to these proceedings. However, defendant-father has raised these issues by allegations on his cross-complaint. Even the proposition that the mother of an illegitimate child has a right to custody superior to the world does not preclude a father, putative or otherwise, from challenging the custodial rights of the mother.

It is, therefore, held that, in the best interest of the child, an admitted and adjudicated father does have legal standing to seek custody of his illegitimate child against the world including the mother, and respondent-father has such standing.

*Would Custody in the Mother Be in the Best Interest of Subject Children, or Would Custody in the Father Be in the Best Interest of Subject Children?*

It is the considered opinion of this court that upon careful review of all the evidence, the best interest of both these

children would not be served by granting custody at this time to either the relator-mother or respondent-father.

As to the relator-mother, the court is not convinced that she has cured her admitted previous problems with drugs. As to the respondent-father, he has presented little, or no, evidence as to his capabilities, facilities, provisions and arrangements for the care and nurturing of these children. Instead, he mounted and concentrated an attack on the mother's unfitness to which he unquestionably contributed. In fact, based upon the testimony of respondent-father, it is clear that the facilities and environment in which he is now keeping said children is not in their best interest and is very apparently injurious to their health, morals and welfare.

Therefore, the application of Charlene Gilmore for a writ of habeas corpus is denied. The cross-complaint of Harvey James Wright for custody is dismissed. Temporary custody of Janie Lee Wright and Jamie Lee Wright is hereby granted to the Cuyahoga County Welfare Department, Social Services.

*Judgment accordingly.*