EDEL v EDEL

Docket No. 46321. Submitted February 7, 1980, at Grand Rapids.—
    Decided April 24, 1980.

Sharon M. Edel was granted a divorce from Michael J. Edel,
    Kalamazoo Circuit Court, Robert L. Borsos, J. Custody of the
    couple's minor child was awarded to the defendant. One of the
    considerations of the trial court in determining custody was
    that the plaintiff, a white woman, was going with and planning
    to marry a black man. The plaintiff appeals. *Held:*

    1. The mother's association with a person of another race was
    not relevant to a custody decision and should not have been
    considered.

    2. Upon remand for a rehearing of the custody issue before a
    different judge the parties should be afforded the opportunity to
    bring the record up to date by supplementing the record with
    whatever proofs they wish to present and that the court deems
    to be relevant to the child's custody. The custody decision
    should be *de novo.*

    3. A custody order which is reversed on appeal does not
    create an established custodial environment. However, the
    court on remand may consider the time the child has spent
    with the defendant.

    Remanded for further proceedings.

1. PARENT AND CHILD — CUSTODY — RACE.

    A parent's association with a person of another race is not a
    relevant consideration in a child custody determination.

2. PARENT AND CHILD — CUSTODY — REVIEW — REMAND — DE NOVO
    REVIEW.

    A trial court's review of a child custody order, after remand from
    the Court of Appeals, should be *de novo* with both parties
    afforded the opportunity to supplement the record with what-

REFERENCES FOR POINTS IN HEADNOTES
[1] 24 Am Jur 2d, Divorce and Separation § 786.
    Race as factor in custody award or proceeding. 57 ALR2d 678.
[2, 3] 24 Am Jur 2d, Divorce and Separation § 793.

ever proofs they wish to present and that the court deems relevant to the child's custody.

3. PARENT AND CHILD — CUSTODY — REVIEW — ESTABLISHED CUSTO-
DIAL ENVIRONMENT — STATUTES.

A trial court, in reviewing a child custody order after remand from the Court of Appeals, is not precluded from weighing the quality and duration of the child's stay with the parent originally granted custody during the pendency of the appeal; however, no "established custodial environment" is created by a custody order that is reversed on appeal (MCL 722.27; MSA 25.312[7]).

*Legal Aid Bureau for Kalamazoo and Van Buren Counties, Inc. (by Roger J. Bus), for plaintiff.*

*John J. Peters, for defendant.*

Before: DANHOF, C.J., and R. B. BURNS and MACKENZIE, JJ.

PER CURIAM. The plaintiff brings this appeal from a judgment of divorce granting custody of the couple's minor child to the defendant.

The plaintiff and the defendant separated in May, 1978. In November, 1978, the circuit court awarded temporary custody of their child, Kristen, to the plaintiff. After trial in May, 1979, the court issued a judgment granting the complaint for divorce, apportioning the marital property and placing Kristen permanently in the custody of the defendant. At that time, Kristen was five years old.

The court's findings reflect the evidence, which shows that Kristen is a healthy and well-adjusted child, with strong affectional ties to both parties. There was little question that both are able parents and are willing to provide very well for the child's economic and psychological needs. The plaintiff has become engaged to a man whose

ability as a stepparent is not open to serious question, who shows a mature respect for Kristen's relationship with her father, and for whom Kristen apparently has a strong liking. As the plaintiff's counsel argued to the trial court, there are no "monsters" in this case.

The defendant intends to remain with Kristen in Kalamazoo, where he works as a computer programer. He has preserved the ties between Kristen and all her grandparents, who also live in that area. The defendant's parents and the plaintiff's sister-in-law are apparently willing to care for Kristen while her father works. The plaintiff's fiance has taken a position as the program director of a radio station in Toledo. It is the plaintiff's intention to take Kristen there with her and to marry this man as soon as his own divorce becomes final. The plaintiff has been offered a part time job in the same radio station.

The trial judge issued his opinion from the bench, evaluating the evidence with reference to the several factors set forth in MCL 722.23; MSA 25.312(3)[1] and prefacing his remarks with the ob-

[1] The statute provides:

" 'Best interests of the child' means the sum total of the following factors to be considered, evaluated and determined by the court:

"(a) The love, affection and other emotional ties existing between the competing parties and the child.

"(b) The capacity and disposition of competing parties to give the child love, affection and guidance and continuation of the educating and raising of the child in its religion or creed, if any.

"(c) The capacity and disposition of competing parties to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

"(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

"(e) The permanence, as a family unit, of the existing or proposed custodial home.

"(f) The moral fitness of the competing parties.

"(g) The mental and physical health of the competing parties.

"(h) The home, school and community record of the child.

servation that the dispute was "one of the most difficult custody cases [he had] had in almost five years on the bench". Considering the statutory factors in order, he found the parties to be equal with respect to most of them, but believed that in three areas the evidence favored the defendant's claim to custody.

The court went on to address one other aspect of the case that it thought was relevant:

"The Court also notes the presence of the boyfriend. Now, the Court states on the record that the boyfriend is black. There has been no mention of it. The Court is not certain whether or not it is correct in mentioning this, but I feel that I must. We have come a long way in race relationships. The Court examined this man very closely when he was testifying. This man is black, but he is not culturally inferior to this woman. They can have a good life if they want to. He appears to be as well educated as she. He speaks well. Maybe this is his training as a radio announcer. He has what sounds like a good job, but it may be sort of a transitory job, because I would guess that if he is successful in Toledo, that he is going to have other opportunities to go to other stations.

"So the life probably will not be as stable as if he stayed in Kalamazoo or if the mother had stayed with the present husband. This is no great disadvantage because if he worked for a corporation, if he worked for General Motors, he probably would expect every five or ten years to be transferred. I doubt that with the radio station he's going to be changing any more often than that, no matter how successful he becomes.

"The Court can't help but think that there is a problem, small one, but nevertheless a problem and rather than to put it on a racial basis, a black against white, the Court would make the analogy of a French

"(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference.

"(j) Any other factor considered by the court to be relevant to a particular child custody dispute."

girl who marries a German and goes to Germany to live. They are both white, but they are going to have problems and they are going to have to overcome those problems. That is the problem that Kristen would also have to live with. Thank goodness those problems are not as great as they were 20 years ago. I think it is an element that this Court in doing its duty has to weigh.

"The same problem occurs when you have, maybe to a lesser extent, when you have an inter-religion marriage. Where the child is going to be raised Catholic or Protestant or Jew. Not to say that those marriages shouldn't take place, but I think that is something the Court has to consider. It would be easier for the Court to duck the issue and to ignore the fact that there is a color difference here. I'm satisfied that the boyfriend does love Kristen very much. I think that he will be a good stepfather to her, whether the child were to be in his home or come to visit frequently.

"I did not ask the child about the boyfriend for several reasons. I am not sure that she could have given me an answer that would have been helpful, but noticing the way he testified on the stand, I don't think that he could have faked that feeling that he has of Kristen and I'm sure that if I could have had unlimited time with Kristen and opened her mind, that she probably would have had a very warm feeling towards him. The time did not permit that and I don't think I have the skills to do this, to illicit [sic] from her even if I did have the time.

"There is another element the Court wants to discuss about the boyfriend, and that is this. Even without the child, the mother and the boyfriend, and I think they are both honest, I think they both intend it when they say they are going to marry as soon as they are free to do so, but they are going to have some adjustment to make. They are going to have to get acquainted with each other. I don't think it is going to be as easy with Kristen in the picture, at least in the beginning. They hope to have their own children. I hope they do, but I think to avoid the mother having a second unfortunate marriage where she feels that she perhaps made a mistake, that maybe the first year or two they probably

should focus on each other and not be too distracted by other obligations.

"The Court recognizes that the marriage may never come about, but I think they are both sincere and I think they both want the marriage and unless something dramatic happens, I think that they will marry when they are able to."

The consideration of race in child custody matters has apparently never been directly addressed by the courts of this state. We have encountered *Potter v Potter*, 372 Mich 637; 127 NW2d 320 (1964), in which the Court reviewed an award of custody of a young child to her father, after her mother had removed the child to California in violation of a court order. While in California, the mother married a man whom she had been seeing before her divorce. A plurality of the Court wrote:

"An attempt has been made by counsel for [the mother] to inject into the case questions of civil rights, under the Fourteenth Amendment to the Federal Constitution, involving racial equality. As the basis for such attempt, counsel point out in their brief that: 'Plaintiff and defendant are white. Dr. Baugh is a Negro.' It is established by the record that Dr. Baugh is appellant's present husband and the 'Mr. X' referred to in the pleadings and proofs. It is obvious from the opinion of the circuit judge that he did not consider such racial differences as of special significance at the present time. We fully concur in this view. Possible developments in the future because of the situation referred to are matters wholly of speculation and conjecture, and as such may not affect the present determination of the case. What we actually have before us is the matter of the custody of a young child as of the present time. The trial court has, of course, the reserve power under the statute to modify the decree in the respect here involved in the event of changed circumstances." 372 Mich at 648.

Courts in a few other states have encountered the problem in a variety of situations and have shown little favor for the use of race as a factor in custody decisions. The subsequent marriage of the white mother of an illegitimate child to a black man was held to be an improper basis for lodging custody of the child with its white father in *In re Brenda H,* 37 Ohio Misc 123; 66 Ohio Op 2d 178; 305 NE2d 815 (1973). Even more to the point is *Commonwealth ex rel Myers v Myers,* 468 Pa 134; 360 A2d 587 (1976), in which a white father sought custody of his children from their white mother because her stable but unsolemnized relationship with a black man threatened the children's "racial identity". The race of the mother's paramour was held to be "not relevant" in deciding the issue. *Myers* relied on the earlier decision of the Supreme Court of Pennsylvania in *Commonwealth ex rel Lucas v Kreischer,* 450 Pa 352; 299 A2d 243 (1973), in which a white father had refused to surrender custody of the couple's children after their white mother married a black man. The court said:

"In its opinion, the [trial] court stated that the benefit of geographical location is a 'highly controversial issue, * * *, and is not conclusive one way or the other.' The basic reason for the court's ruling in granting custody to the father was the existence of the interracial marriage of the mother and the possible detriment that might result to the children from living with the mother under such circumstances.

"* * * In the instant case, the record is completely barren of any evidence that the children here involved will suffer from living with the mother under the existing circumstances. Significantly, the children have evidenced no ill will towards the mother or concern over her second marriage, and no social problems, such as bias or prejudice, ensued while they were under her

care from September 1969 to June 1970. The real issue posed by this appeal is, whether a subsequent interracial marriage by the mother, in and of itself, is such a compelling reason as will warrant a court in denying her the custody of her children. We rule it is not.

"As noted by Judge Hoffman in his dissenting opinion below, there has been a marked increase in the United States in recent years of interracial marriages and trans-racial adoptions, and sociological studies establish that children raised in a home consisting of a father and mother who are of different races do not suffer from this circumstance. * * * We agree wholeheartedly with Judge Hoffman's statement that 'in a multiracial society such as ours racial prejudice and tension are inevitable. If * * * children are raised in a happy and stable home, they will be able to cope with prejudice and hopefully learn that people are unique individuals who should be judged as such.' " 450 Pa at 355-356.

See also *Goldman v Hicks,* 241 Ala 80; 1 So 2d 18 (1941), and *Milligan v Davison,* 244 Pa Super 255; 367 A2d 299 (1976).

We are persuaded by the reasoning of these courts and therefore hold that the trial judge committed a "clear legal error on a major issue" in considering a parent's association with a person of another race to be relevant to a custody decision. MCL 722.27(a); MSA 25.312(7)(a). There was absolutely no evidence or argument that her mother's proposed marriage would have any detrimental effect on Kristen. We seriously doubt that such proof would have been admissible if offered. As the court wrote in *Brenda H, supra,*

"Irrespective of the chances for success or failure of bi-racial or other 'mixed' marriages and in spite of abounding prejudice of all kinds (racial, ethnical *[sic]* and religious) the American 'melting pot' will continue to bring about the marital union of persons of different racial, religious and cultural backgrounds. The law

wisely does not and should not interfere with this process." 37 Ohio Misc at 129-130.

Our resolution of this issue makes consideration of the plaintiff's other claims on appeal unnecessary.

While the record shows that the race of the plaintiff's fiance was a factor in the trial court's decision, it was not the only aspect of the evidence that the trial court found to favor custody in the defendant. Thus, we would not be justified in reversing this decision outright, for both parties are entitled to a decision on the proper merits of their respective cases. The circuit court should redetermine Kristen's custody without reference to the race of the plaintiff's fiance. On remand, the case should be assigned to a new judge.

In practically any other sort of case, a new decision based on the record produced in May, 1979, would be proper, for what is challenged here is merely the court's assessment of the evidence, rather than the character of evidence received; ordinarily, litigants are entitled to only one opportunity to present their cases. However, in this custody dispute, the "litigant" with the most at stake is Kristen. The year that has passed since the trial is a significant period in her young life. Her interests are too important to be determined by a record that may be quite stale. See *Roudabush v Roudabush,* 62 Mich App 391; 233 NW2d 596 (1975). The new judge should therefore afford both parties the opportunity to supplement the record with whatever proofs they wish to present and that he deems relevant to Kristen's custody. His decision should be *de novo.*

We anticipate and decide one additional difficulty that will be encountered in deciding this case on remand. Ordinarily, a hearing or trial on remand is deemed to be the proceeding to which the

party who has obtained appellate relief was entitled in the first instance; remand is ordered because improper events in the original proceeding have operated to the detriment of the victorious appellant. From this rather self-evident proposition flows the corollary that the time spent by a successful appellant in securing the right originally denied should not disadvantage her when those rights are at last honored.

MCL 722.23(d); MSA 25.312(3)(d) directs the trial court to consider in determining the custody of a child "[t]he length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity". The entire Child Custody Act, MCL 722.21 et seq.; MSA 25.312(1) et seq., is perfused with reference to the "best interests" and "inherent rights" of the child. We consider this provision and these statements of policy to be superior to the symmetry of common-law appellate remedies and even to the rights of the plaintiff, who has prevailed in this appeal. Thus, in reviewing Kristen's custody, the circuit court shall not be precluded from weighing the quality and duration of her stay with the defendant during this appeal.[2]

This cause is remanded for proceedings not inconsistent with this opinion. Custody of the child shall remain with the defendant pending the new hearing.

No costs, neither party prevailing in full.

[2] We are of course aware of the increased burden of proof which must be carried by a party seeking a change in a child's "established custodial environment", MCL 722.27; MSA 25.312(7). In light of our decision regarding the role of MCL 722.23(d); MSA 25.312(3)(d) in the proceedings on remand, we believe that the advantage to Kristen the increased burden of proof might provide does not justify the added burden it would impose upon the plaintiff. We therefore hold that no "established custodial environment" is created by a custody order that is reversed on appeal. Cf., Berman v Berman, 84 Mich App 740; 270 NW2d 680 (1978).