## Richmond.

MOON AND OTHERS V. CHILDREN'S HOME SOCIETY OF VIRGINIA.

November 16, 1911.

Absent, Cardwell, J.

1. INFANTS—*Custody—Children's Home Society.*—The act of Assembly creating the Children's Home Society of Virginia furnishes no authority for depriving a mother of the care and custody of her children by a former husband merely because she has married the second time into a family lower in the social scale than that in which she was reared, even though her husband has negro blood in his veins, unless he has such an amount of such blood as, under our laws, would prohibit his marriage with a white woman. The mother, the father of the children being dead, however poor and humble she may be, being of good moral character and able alone, or with the assistance of their stepfather (also of good moral character) to properly support and care for her children, and who is supporting and caring for them, cannot be deprived of that privilege by the defendant in error under the provisions of its charter.

Error to a judgment of the Circuit Court of Albemarle county in a statutory proceeding to commit infant children to the Children's Home Society of Virginia. Judgment for the applicants. Defendants assign error.

*Reversed.*

The opinion states the case.

*George E. Walker,* for the plaintiffs in error.

*S. S. P. Patteson,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

93

Madeline Grasty, aged twelve years, and Ruby Grasty, aged ten years, were taken from the custody of their mother, Lucy Moon, one of the plaintiffs in error, and committed to the care, custody and control of the Children's Home Society of Virginia, the defendant in error, by an order of the Circuit Court for Albemarle county affirming the action of a justice of the peace in and for said county, in a proceeding instituted under an act approved March 10, 1902, amending and re-enacting an act incorporating the defendant in error.    Acts of Assembly 1901-2, Ch. 137, pp. 125-127.

Section 9 of that act is as follows: "Whenever any child under the age of fourteen years, by reason of orphanage, or of neglect, crime, drunkenness, or other vice of the parents or other persons having custody of such child, is growing up without education or salutary control, and in circumstances exposing such child to a dissolute and vicious life, or is an inmate of any public poorhouse or almshouse in this State, any officer, agent, or member of said society may make complaint thereof to any justice of the peace or police justice, and it shall be the duty of such justice of the peace or police justice to issue his process, commanding that said child be brought before him as soon as practicable.    The person having custody of such child shall also be summoned to appear at the time and place of hearing said complaint, and any witnesses he or she may desire shall also be summoned and heard in his or her behalf.    If, upon such hearing, it appear that the complaint is well founded, and that the interests of such child demand that it should be relieved from such vicious or unsalutary surroundings, or should be removed from such poorhouse or almshouse, such child shall by order in writing be committed by such justice of the peace or police justice to such society until he or she shall attain the age of twenty-one years."

The question involved in the case is whether or not, upon the facts before the court, the act authorized it to deprive the mother of the custody of her children.

The evidence as certified by the court and the reason upon which it based its action are as follows:

"Be it remembered that on the trial of this cause the following facts were proven:

"That Lucy Moon, whose maiden name was Lucy May, and who was a grand-daughter of George Christopher Gilmer, one of the most prominent citizens of this county, was prior to her marriage to John Moon the widow of one I. B. Grasty, by whom she had two children, the infant defendants, Madeline, being now twelve years of age, and Ruby, ten years of age; that Mr. Grasty, the former husband of Lucy Moon, died leaving her in destitute circumstances; that she with her two infant children was offered a home with her brother Lee May, who married one Bessie Moon, the sister of her present husband, John Moon; that she continued to live with her brother and was given no assistance from her parents or husband's people; that although both she and her husband were residents of this county they went to Washington, D. C., and were married; that since her marriage to her present husband, John Moon, he has comfortably provided for her and her two children by her former husband; that these two infant defendants are not neglected as far as physical comforts are concerned, and no drunkenness or vice of their adults was proven. It was proven, however, that John Moon has negro blood in his veins; that his mother, Margaret Moon, of whom he is the illegitimate son, has according to her statement one eighth of colored blood in her veins. The said Margaret Moon appearing upon the witness stand it was plainly apparent to the court and to counsel and to spectators that she would pass anywhere as a mulatto woman. John Moon, Sr., the father of John who married Lucy Moon, had a large

family of children by the said Margaret and left each of them a tract of land upon which they now reside, but on account of having colored blood they are recognized as colored people in the county, one of his children having married a colored man at Scottsville, Wash Lewis, though some of the others had intermarried with white people, all of the marriages, however, taking place out of this State, and white citizens visited their homes and took meals with them; but this was not a general custom.

"It was proven further that Madeline and Ruby Grasty were properly clothed and physically well taken care of, that they had been sent to a public school, but after their mother's marriage with John Moon they left the public school; that since her marriage with the said John Moon the mother applied for the admission of the children at the Miller Manual Labor School in Albemarle county, and in the statement filed with the application for their admission into the school, which is a part of the defense in this case and will be filed with the record, she stated that these children were the children of her husband the said I. B. Grasty; that after the children had been at school some time she made repeated efforts to get them away from the school and on being refused finally made an application for their withdrawal in writing, in which she certified that they were not the children of Grasty but the children of the said John Moon, although they had been born, one during the lifetime of Grasty and one but a short time after his death. The children were thereupon surrendered to her by the school—children with colored blood in their veins not being allowed to enter the school, and even with the suspicion of such blood their condition would be unendurable at the school; that these two infant children had not been cruelly treated and were controlled and looked after; that there were no dissolute characters permitted at the house of John Moon, nor was there any drinking or improper

conduct there; that the said John Moon was not a man of means, but had a farm and comfortable home and was able and willing to care for the two infant defendants; that the said children had never attended the public school since their return from the Miller school, but were taught by their mother or some of the Moon connection.

"It was also proven that the said Moons, because of their color, did not associate on terms of equality with the people in their neighborhood, but formed a coterie to themselves and had few associates outside; that several of the Moon children had married white people out of the State, but that they all then returned to go upon the farms which had been given them by John Moon, the elder, who was a white man.

"It was also proven that the said Lucy Moon alleged that the children were badly treated at the Miller school, and that their persons were neglected, but it was proven by the superintendent of the school that the children were carefully looked after, that there was a resident physician at the school, and that both their physical and moral well-being were cared for.

"After the above facts were proven, the court entered an order giving the custody of the infant defendants to the Children's Home Society of Virginia, stating that it did so because their mother had married a person with colored blood, who was only recognized as a colored man, and that the associations of these children, who were of pure blood and gentle ancestors, would be with persons of mixed blood, and that they would be deterred from association with gentle people of white blood."

It is clear from the facts certified that the act of the General Assembly furnished no authority for the action of the court in depriving the mother of the custody and control of her children. The children were not neglected, but were comfortably cared and provided for by their mother and their step-father. It does not appear that

either from neglect or crime, or drunkenness, or other vice of the mother or her husband the children were growing up without education or salutary control and in circumstances exposing them to a dissolute and vicious life. On the contrary, it appears that dissolute persons were not permitted at their home, and neither drinking nor improper conduct were allowed there. It further appears that while the children had not gone to the public schools since their return from the Miller school, they were taught by their mother or some of the Moon connection.

The act of Assembly furnishes no authority for depriving a mother of the care and custody of her children merely because she has married into a family lower in the social scale than that in which she was reared, even though her husband has negro blood in his veins, unless he has one-fourth or more of such blood and is therefore a "colored person" within the meaning of section 49 of the Code and prohibited under our laws from intermarrying with a white woman. Code secs. 2252, 2253, 3783, 3788. It is not pretended in this case that the step-father was a colored person within the meaning of our statute, or that he and the mother of the children were guilty of any crime in intermarrying, or were not persons of good character.

The mother, the father of the children being dead, however poor and humble she may be, being of good moral character and able alone, or with the assistance of their step-father (also of good moral character) to properly support and care for her children, and who is so supporting and caring for them, cannot be deprived of that privilege by the defendant in error under the provisions of its charter.

We are of opinion, therefore, to reverse the order of the circuit court and enter such order as it ought to have entered dismissing the proceeding commenced before the justice of the peace and restoring the said children to the custody of their mother, the plaintiff in error.

*Reversed.*