Stanley Gartenstein, J.
The within neglect proceeding involves dispositional issues centering around a Black child now in temporary residence with a white foster mother and two other siblings now in foster care with a Black family. Return of all children is requested by the natural parents.
On November 10, 1975, a petition was filed by the Bureau of Child Welfare alleging that the child DeSean was abandoned by the respondent mother on or about January 20, 1975, with one Louise F., and that the children, Tracey and Kinyetta, in February, 1975 with one Carole M. The petition alleges that no provisions were made for their support and care and that the respondent natural parents were at the time of the petition undomiciled and unable to provide shelter for the children.
On April 9, 1976, this matter appeared before the undersigned for trial at which time the foster parents with whom the children were living by virtue of court remand appeared and were granted leave to participate as copetitioners. On that date the respondent parents admitted charges of unspecified neglect pursuant to section 1051 of the Family Court Act in satisfaction of the entire petition on consent, for the purpose of conferring jurisdiction upon this court to make a disposition in the best interests of the children.
At the time of the hearing, it was agreed that the court was confronted with what appeared to be basically a custody dispute between the foster parents and the natural parents who had rehabilitated themselves to a point where they were ready to reassume care of the children.
After investigation and report, the matter appeared before the undersigned for disposition on November 23, 1976, at which time probation recommended that the children be placed with the Commissioner of Social Services to reside with the foster parents with whom they were then residing. The court, criticizing the recommendation of the probation officer, pointed out that same was based on his value judgment as to which set of parents could provide more material benefits to the children without regard to preservation of their cultural *495 background and their right to be raised by their natural parents. The court was concerned with the fact that DeSean was living with a white foster parent and with the possible effects upon DeSean and his right to grow in a Black environment, preserving his "Black pride”. Psychological reports were ordered on all the parties and the children. These reports do not rule out custody either by the foster parents or by the biological ones.
Our first consideration must be the fact that these children have natural parents who are not ideal, but who are nevertheless adequate under proper supervision. Lacking overwhelming factors which might lead the court to intervene to deprive parent of child and vice versa, these children, as do all children, belong with these parents. The fact that there has been an adjudication of neglect does not ipso facto justify that the court consider placement. In point of fact where a finding of neglect is made, the statute recognizes that further intervention by the court may be unnecessary, and even permits outright dismissal. (See Family Ct Act, § 1051.) A proper median course, one might expect, would be the utilization of proper service systems, a function of the Bureau of Child Welfare charged with care of children and with holding families together. This preservation of the family and the delivery of supervision are not mutually exclusive ideals.
The court recognizes that the home of DeSean with Louise F. would be superior in some ways to that of the biological parents. It can provide more material comforts than that of the parents; gives him an opportunity to be raised with his foster mother’s undivided attention as an "only child”; and is in a more affluent neighborhood with access to better schools. But this is not of sufficient weight to justify the court’s turning to the drastic alternative of placement as opposed to quality supervision. We must recall that this is not a custody proceeding between two persons with equal right to custody; or a situation where a child has been with unrelated persons for so long that his psychological well-being will be devastated by removal from these surroundings. We are confronted by a foster mother who seeks custody out of an understandable love she has built for the child and her fulfillment in seeing him nurtured and developed while with her. But we must put this relationship into perspective by examining the foster home available to the two other siblings who live in crowded surroundings with the other set of foster parents. It is prefer *496 able that these siblings return to the adequate living quarters which the respondent parents now have.
Clearly, were it not for the incredibly close relationship between Mrs. F. and DeSean, there would be no hesitancy to return all children to these parents who are now together with the physical and emotional wherewithal to care for all their children.
In the long run we are influenced by two considerations. First, if we opt to return the other siblings to the parents, or if we keep them where they are, this decision will have the effect of separating these children. In Obey v Degling (37 NY2d 768, 771), the Court of Appeals stated: "Young brothers and sisters need each other’s strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful. The importance of rearing brothers and sisters together, and thereby nourishing their familial bonds, is also strengthened by the likelihood that the parents will pass away before their children.”
We must also consider the interracial aspects of the relationship between Mrs. F. and DeSean. In terms of the court’s personal values it is our belief that racial and ethnic considerations are irrelevant where the emotional ties between people make no room for them — that perhaps the world would be a better place if these values were universal. We must also recognize however, that the power to adjudicate does not carry with it the moral or legal right to superimpose our own values on the lives of those before us. We are cognizant that the concept of "Black pride” is an important one; that this child’s self-image and acceptance of his Black identity are crucial to his adjustment in life and his place in the world. Additionally, Mrs. F. lives alone and there is no male figure in the home with whom DeSean can identify.
In recent penetrating studies conducted by Grow and Shapiro published by the Child Welfare League of America, under the title Black Children White Parents, it is pointed out that certain offshoots of interracial adoptions must be expected in a child’s future life. His perception of cruelty by others resulting from having an interracial parent-child mixture markedly increases with the relative darkness or lightness of his skin compared with that of the parents. Additionally, any child over the age of 11 months so placed is likely to have negative feelings about his own race. The study also points out that a *497 lack of prejudice by the adopting or foster parent or positive attitude toward blackness does not remedy the situation and that in fact, the more social awareness the parent has, i.e., the more "pro Black” that parent is, the higher will be the discomfort correlation of the child. Again, the study points out that the problems of an interracial parent-child situation are much worse for the Black male than for the Black female. Finally, a significant factor in the success of any interracial adoption was the correlation between successfully married parents, i.e., both parents, and the tendency towards aggressiveness on the part of the child. Parents who had been living together for a long period of time tended to produce children with less destructively aggressive tendencies. The reverse was also true in that single parent adoptions carried a significantly lower probable rate of success. Among parents in interracial adoption situations interviewed, 96% stressed the importance of marital adjustment and of a satisfactory two parent home.
Another penetrating study by Professor Amusie Chimezie, entitled Transracial Adoption of Black Children (Social Work, July 9, 1975) states:
"Until empirical studies are made of the adult personalities of white-raised Blacks, placements of Black children should not proceed as if it had already been ascertained that transracial adoption is beneficial.
"Black fears and hypothesis about what could happen to Black children raised by whites can also be based on lessons of the past — In view of this, it is easy to see the reason for the fear that white-raised Black children could develop dysfunctional coping mechanisms and psychologically suicidal and fratricidal attitudes.”
It must be pointed out that the foregoing holds true when applied to the most stable of nonbiological placements that of adoptions. The corresponding rate of negative factors must be held exascerbated when the less stable foster parent relationship we have here is considered.
The court determines that DeSean’s best interests dictate the developing of his own identity; relating to his own parents; and coming to terms with who he is in the context of his own background. In short, DeSean is entitled to his "Black pride” and to be raised by his Black parents. This does not mean that Mrs. F.’s work is unappreciated and that the court is not impressed with the tremendous devotion she shows him. She *498 was there when needed and her place in DeSean’s life can never be taken from her.
While the court so holds, it must recognize that there are strong ties between DeSean and Mrs. F. For this reason, the court feels that it would be unnecessarily disruptive to remove DeSean from her home immediately. Accordingly, the court orders the immediate return of his siblings to the biological parents under Bureau of Child Welfare supervision toward the end that they provide a home for them and prepare for DeSean’s return. DeSean is placed with the Commissioner of Social Services to reside with Mrs. F. until August 1, 1977. This should allow DeSean time to finish his school year in June and have one month of transition with Mrs. F. before returning to his biological parents. Additionally, it will provide one month of residence with the biological parents before he starts his new school in September. The Bureau of Child Welfare is directed to work with Mrs. F., the biological parents, and all the children in effectuating a smooth transition. This is the time for forward looking social work rather than automatic application of old cliches or concepts.
The court in recognizing Mrs. F.’s love for this child is confident that it is strong enough and sufficiently selfless to allow him the right to grow up well adjusted in his own identity in the company of his own siblings and parents.