OPINION OF THE COURT
Eli Wager, J.
Bethany Farmer is the six-year-old daughter of Linda Farmer, her white mother, and Billie Farmer, her black father. In this action for divorce both parents seek custody of Bethany. An uncommonly long and bitter nonjury trial was centered on the father’s contention that the best interests of this child of an interracial marriage can be achieved only by awarding custody to him, the parent with whom she will be racially identified by a racially conscious society.
Framed another way, the larger question presented for determination by the court is, where custody of a child born of an interracial marriage is at issue, do the obvious racial characteristics of the child and society’s identification of the child compel a finding that the best interests of the child lie with the parent with whom the child is racially identified?
Countering the father’s contentions in this case, the mother argues that race is but one of many factors, and not the overriding factor, in determining the best interests of an interracial child in disputed custody proceedings. She urges that on the facts of this case, she is the more appropriate custodian.
I. BACKGROUND OF THE LITIGATION
Linda Farmer and Billie Farmer were married on December 5,1973 in this State. They resided as husband and *138 wife with their only child, Bethany, in a one-family home in Amityville, owned by them as tenants by the entirety. Her complaint alleged one cause of action for cruel and inhuman treatment consisting of a combination of physical abuse and infidelity. In addition to a judgment of divorce, plaintiff prayed for custody of their infant child Bethany, alimony, child support, possession of the marital residence and incidental relief. The husband’s answer denied the material allegations of the complaint and asserted a counterclaim for divorce based upon allegations of cruel and inhuman treatment. He charged her with neglect and abuse, verbal and physical, as well as abandoning the marital residence and concealing herself and the child from him. He pleaded for custody, for possession of the marital residence and for incidental relief.
II. THE DIVORCE TRIAL
(Portions of this section deleted for purposes of publication.)
Suffice it to say that I found that the plaintiff Linda Farmer proved her cause of action for cruel and inhuman treatment against the defendant and I further found that the defendant’s counterclaim for divorce based upon cruel and inhuman treatment failed for want of proof. Accordingly, I granted a judgment of divorce in favor of the plaintiff.
The formal written judgment containing findings of fact, conclusions of law and an interim order with incidental relief, dated June 3, 1980, was entered in the office of the County Clerk of Nassau County on June 5, 1980. That judgment provided for the award of interim custody to the plaintiff “pending final order of this Court” with visitation to the defendant, an award of child support of $45 weekly and for the disposition of the marital residence (not occupied by either party) by way of a sale and preservation of the proceeds. The judgment specifically provided that all questions of final custody, support, alimony and counsel fees “shall be held in abeyance pending further order of the Court”.
On June 3, 1980, the same day the judgment of divorce was signed, the court was advised by counsel that Billie *139 Farmer had taken Bethany Farmer during a visitation period, with the apparent intention not to return. The child was later discovered residing with him in San Francisco, California, and was retrieved by the mother by the exercise of self-help on or about the 23rd day of October, 1980.[1]
The court wishes to stress that the decision hereinafter set forth with respect to the custody of Bethany Farmer is not based upon, nor is it the result of, the violation of its June 3, 1980 judgment providing for the mother’s interim custody of Bethany. The award of permanent custody of this child is based upon the court’s finding as to her best interests and is grounded solely upon the evidence adduced at the trial.
III. COURT HISTORY OF THE CUSTODY DISPUTE
During the course of the matrimonial litigation, the defendant father moved by order to show cause for pendente lite custody of Bethany. It appears that the plaintiff mother had removed herself and the child from the marital residence and had not disclosed her whereabouts to him. A hearing on the matter was directed before me on November 30, 1979. An extensive conference resulted in an interim pendente lite order on consent dated December 27, 1979, which continued custody in the mother, with visitation by the father and disclosure of the child’s residence information to the father, mutual orders of protection and child support in the sum of $22.50 weekly. Since counsel were both of the opinion that the principal issue on the trial would be the disputed custody of Bethany, my order provided that the family would submit themselves to the Probation Department of Nassau County for a complete investigation. Such investigation includes an evaluation and report by the Division of Forensic Services of the Department of Psychiatry and Psychology of the Nassau County Medical Center.
IV. THE PROBATION REPORT
(All but the conclusion stated in this report has been deleted for purposes of publication.)
*140 “In view of the above, it is respectfully recommended that the custody of Bethany Farmer be granted to her mother Linda Farmer”.
V. THE FORENSIC SERVICES REPORT
(All but the conclusion stated in this report has been deleted for purposes of publication.)
With respect to Bethany, the report discloses her to be “functioning well, and to be basically emotionally healthy and well-adjusted *** exceptionally bright and intelligent * * * not the slightest evidence that Bethany was not being cared for well * * * All of the above leads us to the conclusion that there does not seem to be any justification whatever to remove Bethany from the care of her mother”.
VI. USE OF THE COUNTY’S REPORTS AT TRIAL
(Deleted for purposes of publication.)
VII. EXPERT WITNESSES
(Portions of this section have been deleted for purposes of publication.)
The parties offered the testimony of five experts in the field of psychology, social work and psychiatry in support of their respective cases. Three testified for the defendant father and two for the plaintiff mother. It is to the credit of these professionals that in almost every case the court gleaned from them significant information that was more professional than partisan. Their interest in an appropriate disposition for the child transcended their personal commitment to the party who called them to testify. Their • agreements on critical aspects of this problem are persuasive.
All agreed that the child of this interracial union, with evident black physical characteristics, however subtle, will be perceived by society at large as a black child. Such a child can be expected to endure identity problems, which can be exacerbated in her because of the mixed racial heritage. Social and psychological problems can result from the unresolved internal conflicts which are the product of confused identity. The consequences can be damaging and destructive.
*141 It was conceded by the defendant’s witnesses that black children of two black parents can suffer related identity problems as can white children of two white parents. The mixed heritage of an interracial child is evidently a complicating factor as to which there is scant clinical authority available to instruct us. None would state categorically that in every such marriage custody of the child should be determined by its dominant racial characteristic. There follows significant brief digests of the experts’ testimony:
For the defendant, Dr. Harold Russell, a psychotherapist: Bethany will need black family support in growing up since black people have, in his opinion, been more tolerant of persons with interracial backgrounds. He stressed the significance of the different experiences encountered by blacks as opposed to whites in our society and acknowledged the increase in interracial adoptions as being preferable only to institutional care. In sum, Dr. Russell’s emphasis was on the need for racial identity for Bethany with her black heritage since society will view her as a black person.
Dr. William Sutton, for the defendant: It is important psychologically for a black child to have a black identity. Dr. Sutton stated that in the raising of a child “love is a very powerful force.” He could not in integrity say that the only course of action for the court is to place the child with its black father or that placement with its white mother would be detrimental. He opined that “with respect to Bethany, as she views her mother and her, she’s not dealing with blackness and whiteness, she’s dealing with mother and father. I cannot say that Bethany cannot be raised well and with all the love and what have you with her mother.”
Dr. Sutton eloquently put the child’s identity problem in perspective: “What I’m trying to say, a black youngster who is raised in a black home, of course a possibility exists that the youngster will still grow up with problems. I was trying to put things into perspective. If I’m a black youngster raised in a black home, if I clearly know who I am, if I have all sorts of role models around me, even though there may be a number of slings and arrows thrown at me from without, at least I can sustain myself within the group.”
*142 Dr. Arthur Dozier, for the defendant: He could not make a recommendation contrary to that of the county since he had never interviewed Mrs. Farmer. He believed that this child, if she identifies herself as a white child, will have a greater probability of problems. Her ability to cope with identity problems will depend upon the support she gets from parents and from her own experiences as she matures. In this respect he believes a black identification will serve her best, saying “Black people, in a general sense, have been more accepting of the ‘zebras’ that have occurred, from Jeffersonian times to date. Black people have had the opportunity to work through, psychologically, the differences in terms of gradation of coloring that have occurred because of interracial mixtures, as opposed to the more Aryan concepts that have been espoused by the Caucasians of the country. So, therefore, it would seem to me that what would be of primary concern to me in evaluating this situation would be to see to it that Bethany had the kind of support that would be sensitive, the kind of support that would be open to nurturing her through these crises that she will face.”
Dr. David J. Bearison, for the plaintiff: He testified that while race is an important issue to be considered, it is not a controlling factor. Rather, it is the child’s perceptions and the child’s perspective of itself received from the nurturing parent. Nurturing is the relationship between parent and child that accords the child a sense of security, stability, warmth, love and affection, the key terms being security and stability. He agreed that the primary factors are care and affection shown to a child, the relative stability, economic and/or emotional, of the respective parents, the atmosphere of the home, the parenting ability and the quality of the parents’ availability to the child.
Dr. Gordon F. Derner, for the plaintiff: He viewed the county’s forensic report as disclosing that the child favors the mother and that she indicated good mental health. Dr. Derner’s testimony was to the effect that the best interests of the child can best be defined in the child’s heed for love, warmth and caring, the concern and interest of the parent, the continuity and consistency of parenting and the proper discipline. Economic stability is valuable; emotional sta *143 bility is crucial, educational background is not necessary; however, the better educated can be said to have a better grasp on some of the issues affecting the child’s rearing process. How the parent relates to the child, the parents’ communication with the child, which includes the sharing of emotions, is crucial.
In his view, race has low priority on the scale of values in determining best interests. The color of the custodial parent is immaterial to the child. The crucial aspect of one’s well-being is the significant relationship a child can have with others. Most important is which parent has the most maturity, has made the better social adjustment and has the greater ability to show love and affection to the child.
He viewed comfort, solace and emotional support given to a child as more important than race which he said is not a priority issue. He believed that Bethany will see herself as black and that her sense of self-worth will depend upon the loving and caring she receives from the custodial parent as well as the noncustodial parent.
He said this child is white as well as black and what will be important to her is how her parents’ sensitivity to her will affect her. A person’s value structure first comes from “mothering” (which need not be the female parent).
A strong ego helps one to deal with the “slings and arrows” and rejection of society. Either parent may be equipped to deal with the problems that will confront Bethany provided the parent has a sensitivity of the problems of a black person in a white society. A child of mixed race, however, has different attitudes than that of a white or a black child. Any person can see themselves as inferior, equal to, or superior to other persons irrespective of their racial composition.
VIII. THE LAW
A survey of recorded judicial decisions reveals that the significance attached to racial issues in child custody and adoption proceedings depends upon the nature of the case. In a custody dispute between parents of the same race, the fact that one of them has married or lives with a member of a different race is viewed as of little or no significance (Langin v Langin, 2 Ill App 3d 544; Matter of Kramer, 297 *144 NW2d 359 [Iowa]; Edel v Edel, 97 Mich App 266; People ex rel. Portnoy v Strasser, 303 NY 539; Matter of Brenda H., 37 Ohio Misc 123; Commonwealth ex rel. Myers v Myers, 468 Pa 134; Commonwealth ex rel. Lucas v Kreischer, 450 Pa 352). On the other hand, racial issues appear to play a more decisive role in custody disputes between a natural parent and a nonparent. For example, in Raysor v Gabbey (57 AD2d 437) where the black father and the white maternal grandparents of a biracial child sought custody, the appellate court reversed the trial court’s award of custody to the grandparents upon the ground that the lower court had not shown sufficient interest in the grandparents’ ability “to recognize the stresses arising through racial differences and deal with them intelligently” (57 AD2d, at p 442). “[I]t would seem self-evident”, the court reasoned, “that a child of a racially mixed union potentially faces special problems unknown to a child whose parents are both white or both black. Any decision on custody ought to reflect an awareness of the court of these problems and some consideration by it of which prospective custodian is best able to guide the child, not only for the present, but when she confronts them in the future” (57 AD2d, at p 442).
In Matter of B. (89 Misc 2d 493, 497) the Family Court in Kings County in a neglect proceeding awarded custody of a black child to the natural parents rather than to the white foster parent as probation had recommended, reasoning that the child’s best interests dictated, inter alia, developing his own identity and that he was “entitled to his ‘Black pride’ and to be raised by his Black parents.”
The determinations made in both Raysor and Matter of B. (supra) were predicated upon the presumption that a natural parent has superior custody rights, as well as upon the court’s concern about the ability of a potential nonparent custodian to deal with the problems faced by an interracial child or by a child of a different race.
Race is a factor of less significance in custody disputes between biological parents of interracial children than it was in either Raysor or Matter of B. (supra). In such cases the general rule appears to be that race is simply one factor among many others which should be considered in deter *145 mining what is the child’s best interest. Thus, in Fountaine v Fountaine (9 Ill App 2d 482), the court reversed the trial court’s determination that it was in the children’s interests to remain with their black father rather than with their white mother since the children “looked like colored children.” The appellate court reasoned that: “In passing upon the question of how the interests and welfare of the children will best be served, the court can and should take into consideration all relevant considerations which might properly bear upon the problem. However, we do not believe that the question of race alone can overweigh all other considerations and be decisive of the question. In re Adoption of a Minor, 228 F. 2d 446; Moon v. Children’s Home Society of Virginia, 112 Va. 737, 72 S.E. 707” (9 Ill App 2d 842, 846).[2]
In Tucker v Tucker (14 Wash App 454), an appellate court in Washington, citing Fountaine (supra), made a similar ruling upon similar facts. The authority for both Fountaine and Tucker was Matter of a Minor (228 F2d 446), an influential decision from the Federal courts frequently cited, particularly in adoption proceedings (see Drummond v Fulton County Dept. of Family & Children’s Servs., 563 F2d 1200, cert den 437 US 910; Compos v McKeithen, 341 F Supp 264; Rockefeller v Nickerson, 36 Misc 2d 869; State ex rel. Portage County Welfare Dept. v Summers, 38 Ohio St 2d 144; Ann., 54 ALR2d 909).
The petitioner in Matter of a Minor (supra) was the black husband of a white mother who sought to adopt her white child. The trial court had rejected the petition because of what the court perceived to be the difficult social problem the white child of a black father would face. The Court of Appeals reversed, reasoning that a determination based solely on race would not serve the best interests of the child. Judge Bazelon, writing for the court, ruled that: “There may be reasons why a difference in race, or religion, may have relevance in adoption proceedings. But that factor alone cannot be decisive in determining the child’s *146 welfare. It does not permit a court to ignore all other relevant considerations” (228 F2d, at p 448).
Although Matter of a Minor was not cited in Beazley v Davis (92 Nev 81), a third case in which custody of interracial children was sought by each of the biological parents, the court arrived at the same result. In Beazley, the -trial court had awarded custody to the black father solely because the children had “negroid physical characteristics”, a holding reversed on appeal upon the ground that it created an impermissible classification under the Fourteenth Amendment and that the inquiry should have focused on the children’s best interest.
Research reveals only one appellate court decision in which the question of race was a significant factor in the resolution of a custody dispute between the natural parents of an interracial child. In the case — Ward v Ward (36 Wn 2d 143,145) — custody was granted to the black father (actually to the black father’s mother) rather than to the white mother upon the ground, inter alia, that the children, described by the court as “colored”, would have “a much better opportunity to take their rightful place in society if they are brought up among their own people.” Ward was decided more than 30 years ago, was expressly repudiated in Tucker (supra) (a later case from the same jurisdiction) and has been cited nowhere else. The rationale expressed in Ward is rejected by this court as it has been by all subsequent decisions and indeed, by society.
In summary, it appears that the majority rule promulgated by appellate courts throughout the country (although not always followed by courts at nisi prius) is that race is of little or no significance where the issue is custody in a parent married to or living with a person of a different race, that it is of more significance where the dispute is between parents and nonparents, but that it is simply one of many factors which may be considered in a contest between biological parents for custody of an interracial child. Primarily, the court must concern itself with the best interests of the child which, in this case, has mandated a careful review of the entire record together with the submitted contentions of counsel (Braiman v Braiman, 44 NY2d 584, 591; Matter of Nehra v Uhlar, 43 NY2d 242, *147 246; Finlay v Finlay, 240 NY 429, 433-434; Domestic Relations Law, § 240).
IX. CONCLUSION
The defendant father’s thesis — that the best interests of this child of an interracial marriage compel the award of custody to him because society will perceive her to be black — must be rejected. As between two natural parents of different races who have opted to have a child, neither gains priority for custody by reason of race alone. Nor can race disqualify a natural parent for custody. The course of the child’s future life will indeed be affected by her mixed heritage but it may be more severely affected by an inappropriate custody disposition.
Based upon all the evidence in this case and in the best interests of the child, this court is convinced that custody of Bethany Farmer must be awarded to her mother, Linda Farmer. In coming to this determination I have considered the race of the parties and the child, along with a host of other relevant considerations. Race is not a dominant, controlling or crucial factor. It is to be weighed along with all other material elements of the lives of this family.
Both parents love the child and both want her. The mother is the more stable parent emotionally. The mother is more stable economically, having maintained a consistent pattern of employment. She has provided adequately for the physical needs of the child, prior to and after the separation of the parties. She has demonstrated consistency in her parenting and child rearing. The child’s educational and emotional needs have been met by the mother, who has been available to the child despite her need to work. The child will receive appropriate educational opportunity from her mother.
Lay witnesses, including members of the defendant’s family, testified on behalf of the plaintiff to the effect that she is a competent, caring, warm and stable mother. Their observations were confirmed by the county agencies’ reports and by the court’s own assessment of the plaintiff during her testimony. The court is confident that this mother is possessed of the parenting qualities necessary to nurture this child through the years ahead. True enough, *148 more than one crisis will confront this child as she matures. There is no doubt the mother is best equipped to guide Bethany and to provide her with the opportunity to grow in body and spirit to the development of that degree of ego strength that will enable her to deal appropriately with the special difficulties that will present themselves to her. The mother offers the best hope of raising Bethany to adulthood with an adequate sense of self-worth which, as Dr. Derner testified, is the result of being treated as worthwhile, valuable, important and loved.
Judgment as to incidental relief will be settled after conference with counsel for the parties.

. Since that time the whereabouts of Billie Farmer have been and remain unknown.

. Coincidentally, note that in Fountaine the father seized the children and fled to California subsequent to the court’s decision (see Grossman, A Child of a Different Color: Race as a Factor in Adoption and Custody Proceedings, 17 Buffalo L Rev 303).