OPINION OF THE COURT
Betty E. Staton, J.
These guardianship / custody proceedings present a unique set of facts. However, the legal question is common to all disputes related to the custodial care of a child. At issue is a child’s well-being and the court must decide how a child’s interests can best be served under the circumstances presented. This case involves three adults neither of whom have a blood relationship with the child and two of whom contend that she would be the best caretaker for the child. The third petitioner does not in fact request custody but filed a petition which now supports his mother’s petition for custody.
*842 This case has quite a procedural history.
PROCEDURAL HISTORY
The subject child, Astonn, was born to Marguerite H. on November 3, 1991. The natural mother, also known as Margo, died on December 1, 1991 without ever leaving the hospital after the child’s birth. The child had been released by the hospital on November 3rd to petitioner Sofia D., who applied for appointment as the guardian of the child on December 10, 1991. One day earlier, the maternal grandmother, Marjorie C., filed an order to show cause for custody of the child.[1] On February 26, 1992, Marjorie C. withdrew her petition and Sophia D. was awarded a temporary order of guardianship.
Derrick F., the natural mother’s estranged husband, filed for custody of the child on January 10, 1992. His mother, Leora F., filed a writ of habeas corpus in Supreme Court on May 18, 1992. The writ was consolidated with her son’s Family Court custody proceeding by consent of the parties on May 20, 1992. A paternity petition, filed on January 10, 1992 by Eric J., alleged that he was Astonn’s biological father. That petition was dismissed on April 14, 1992 when the petitioner failed to appear in court. On June 26,1992, the court directed a temporary order of visitation on behalf of Astonn’s half-sibling, Adrienne, to take place at the home of Astonn’s babysitter and the matter was set down for a hearing on the issue of temporary visitation only.[2]
THE FACTS
Astonn, the child at the center of these proceedings, has special needs arising from his respiratory disabilities. An expert in pulmonary diseases, Dr. Cheryl Doyle, gave unchallenged testimony that the child had to be in a living environment that was free of smoke, animals, mites and other offending conditions; that he had to receive several medications at regular intervals daily; that he had to undergo special procedures by nebulizer on a daily basis. Dr. Doyle testified *843 that persons providing care for the child would have to take a general course of instruction on procedures for such care.
Sofia D. lived with the child’s mother for some three years before her death and was given the approval of the child’s maternal grandmother to bring him from the hospital to the home she had shared with Astonn’s deceased mother. The maternal grandmother acknowledged that she understood that Sofia and Margo would cohabit and raise Astonn. Marjorie C. withdrew the petition she had filed for custody of Astonn informing the court that, after considerable reflection, she was in favor of Sofia obtaining custody.
It is uncontroverted that Astonn is not the child of the natural mother’s estranged husband.[3] The child of their marriage and Astonn’s half-sister, Adrienne, lives with her paternal grandmother. The father has been living with Valerie W. with whom he has two children. LaKesha F., born in March 1990 lives with them. D’Andrea F., born in December 1992, lives with her maternal grandmother. Derrick admitted on cross-examination that he went through a marriage ceremony with Valerie while he was still married to Margo.[4] Derrick testified that if he and his mother, Ms. F., were awarded custody of Astonn, the plan was for Astonn and Adrienne to live with Ms. F.
Adrienne has lived with Ms. F. and her husband, Charles F., Adrienne’s paternal grandfather[5] for six or seven years. Neither sought legal custody of the child Adrienne. ’
THE ARGUMENTS
Sofia D. maintains that her appointment as the legal guardian and custodian of the child would be in his best interest. She argues that she has provided a stable environment, responsive to the child’s special health needs, since the child’s birth. Sofia maintains that neither of the F.’s has acknowledged Astonn’s special needs nor displayed an ability to accommodate them. She contends that her status as the lesbian life partner of the child’s deceased mother supports her petition. The denial of her application solely on the basis of race, she argues, would go against the Equal Protection Clause of our Constitution.
Leora F. and her son Derrick argue that while none of the parties have a blood relationship with the child, Astonn, Ms. F. *844 stands in a better position to meet this child’s best interests. They point to the recommendation of the Child Welfare Administration in support of this proposition. The F.’s raise the issue of whether a relationship between petitioner and the child’s dead mother was ever proved and argue that even if it did exist, it does not give Sofia a "claim of right” in determining the custody/guardianship of this child.
As the paternal grandmother and caretaker of the child’s half-sister, Adrienne, they argue that Ms. F., along with her husband, offer Astonn the opportunity to grow up in an African-American two parent family and to exercise his rights to have a continuing relationship with his half-sibling.
The Law Guardian in this proceeding is not convinced that the race or sexual orientation of the members of this child’s proposed family are relevant. While he recognizes Astonn’s need to maintain a strong relationship with his half-sister, the Law Guardian argues that Sofia is the only mother this child has known and that she has been a loving and committed parent.
THE LAW
None of the parties here have a blood relationship to Astonn. However, the lack of a blood relationship does not bar Sofia’s application for letters of guardianship. (SCPA 1703; Matter of Dalida P., 204 AD2d 645 [2d Dept 1994].) Further, under the unique and extraordinary circumstances presented here any of these parties could make an application for custody. (Family Ct Act § 651; Matter of Anonymous v Olson, 112 AD2d 299 [2d Dept 1985].)
In Anonymous (supra) a mother’s death, a father’s incarceration and the apparent consent of the child’s relatives presented a set of circumstances that gave standing to a couple unrelated to the child to seek custody. Here, a mother’s death, a putative father’s disappearance and a maternal grandmother’s withdrawal of a custody petition presents a set of unique circumstances that allows Derrick F. to seek custody and Ms. F. to seek custody under the writ consolidated with her son’s petition for custody.
In the instant proceeding the court is presented with an extraordinary combination of circumstances that must be weighed in determining who would be the best caregiver for this child. The importance of the race of the caregiver, the significance of a party’s physical custody of the subject child’s half-sibling and the lesbian relationship between a party and *845 the deceased biological mother, including plans they made regarding the child, are circumstances unique to this proceeding that the court must consider.
On the issue of race, Sofia, who is Caucasian, argues that using race as the sole determinant of a child’s best interests would be a violation of the Fourteenth Amendment citing Palmore v Sidoti (466 US 429 [1984]).
While the F.’s do not present race as the sole determinant of who should be awarded custody, they argue that in Ms. F.’s custody, Astonn would be raised in an environment consistent with his race, creed and parental heritage.
In Palmore (supra), a divorced white father sought custody of his daughter after his former wife, also white, married a black man. The trial court awarded the father custody solely on the basis of race reasoning that the child, if left in the custody of her mother, would suffer, as she grew older, society’s stigmatization of interracial families. The United States Supreme Court in reversing that decision stated: "Private biases may be outside the reach of the law, but the law cannot directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.’ ” (Palmore v Sidoti, supra, at 432, citing Palmer v Thompson, 403 US 217, 260-261 [1971] [White, J., dissenting].)
The issue of race in the context of a custody proceeding was addressed by the New York State Supreme Court in Farmer v Farmer (109 Misc 2d 137 [Sup Ct, Nassau County 1981]). Farmer involved a divorce and custody proceeding between an interracial couple. The black father there contended that the child would be racially identified with him by a racially conscious society and thus the best interest of the child could only be achieved by awarding him custody. The court there rejected the father’s contention and awarded custody to the mother. The court "considered the race of the parties and the child, along with a host of other relevant considerations.” (Farmer v Farmer, supra, at 147.) The Farmer court stated that: "The mother * * * has provided adequately for the physical needs of the child, prior to and after the separation of the parties. She has demonstrated consistency in her parenting and child-rearing. The child’s educational and emotional needs have been met by the mother, who has been available to the child despite her need to work.” (109 Misc 2d 137, 147, supra.)
Unlike the instant proceeding, both Palmore and Farmer (supra), involved custody disputes between two biological *846 parents. The court in Farmer (supra), reviewed a number of cases from various jurisdictions and noted that: "race is of little or no significance where the issue is custody in a parent married to or living with a person of a different race, that it is of more significance where the dispute is between parents and nonparents, but that it is simply one of many factors which may be considered in a contest between biological parents for custody of an interracial child.” (109 Misc 2d 137, 146, supra.)
This court has found no cases that specifically address the issue of race in the context of a proceeding for custody of a child unrelated to any of the parties to the proceeding. However, it is clear that nothing presented by the facts of this case places it outside of the constitutional constraints set down by Palmore (supra). Further, the fact that none of the parties are related to Astonn presents unique circumstances such that race is simply one of many factors to be considered in determining custody.[6]
The F.’s argue that Ms. F. should be awarded custody of Astonn because Adrienne, his half-sibling, resides with her, and that "it is Astonn’s constitutionally protected right to be raised with his sibling in F.’s home.” Such a bold statement finds no support in the law. The courts generally discourage separating siblings in custody disputes between the natural parents. (Eschbach v Eschbach, 56 NY2d 167 [1982]; Matter of Ebert v Ebert, 38 NY2d 700 [1976].) Even in those situations, whole siblings have been separated where the court determined that it was in the child(ren)’s best interest to do so. (See, Klat v Klat, 176 AD2d 922 [2d Dept 1991]; Matter of Johnson v Johnson, 202 AD2d 584 [2d Dept 1994], lv denied 83 NY2d 760 [1994].)
Under the facts presented here, the law recognizes the right of visitation between siblings and half-siblings. Domestic Relations Law § 71 provides, inter alia, that "the court * * * may make such directions as the best interest of the child may require, for visitation rights for such brother or sister in respect to such child.” (See, State ex rel. Noonan v Noonan, 145 Misc 2d 638 [Sup Ct, Kings County 1989].)
Sofia contends that her relationship with Margo as her lesbian life partner supports her right to be named as Astonn’s guardian. The court rejects this contention. Sofia’s sexual relationship with the child’s mother neither supports her petition *847 nor bars it. The fact alone that Sofia is a lesbian is not determinative of her fitness to be Astonn’s guardian. Only if a sexual lifestyle, homosexual or heterosexual, was shown to be detrimental to the child’s well-being would it be considered. (Guinan v Guinan, 102 AD2d 963 [3d Dept 1984].) Nor can this court base its decision in this case on a past relationship and unfulfilled plans. Astonn is not a statistic nor is he property. Additionally, the court does not view this case as a cause celebre.
The court’s obligation here is to "make every effort to determine 'what is for the best interest of the child, and what will best promote its welfare and happiness.’ ” (Eschbach v Eschbach, 56 NY2d 167, 171 [1982], supra [citations omitted] [quoting Domestic Relations Law § 70].) The court must look at the home environment, the quality of parenting, and the child’s emotional, medical and intellectual needs. (Matter of Louise E. S. v W. Stephen S., 64 NY2d 946 [1985].) Derrick F.’s marriage to Astonn’s deceased mother and Ms. F.’s physical custody of Astonn’s half-sibling is not determinative of who should be Astonn’s caretaker. Sofia’s and Margo’s relationship and their plans to raise a child together is not determinative of who should be Astonn’s caretaker. The relationship of these parties with the child upon his birth and after Margo’s death controls this court’s decision.
DISCUSSION
Each of these parties point to his or her relationship with the mother of this child and or the child’s half-sister as supporting, in part, their applications in these proceedings. While it is not dispositive, the court finds that the testimony by Sofia D. that she and the decedent maintained a lesbian relationship was not rebutted and was, in fact, supported by testimony by the maternal grandmother, Marjorie C. Although Leorá F. denied knowledge of such a relationship, her own witness, Etta M., testified that Leora F. told her that decedent was living with a lesbian. There was never any allegation that Sofia acted in any manner that was detrimental to the child. Sofia D. lived with the decedent Marguerite H. from sometime after February 1989 to the time of her death on November 11, 1991. Sophia shared the expenses of the household, purchasing food, paying rent and other expenses including clothing and tuition for Adrienne.
Sofia was present in the delivery room during Margo’s labor and at the time of Astonn’s birth. When Margo was *848 placed in intensive care, Sofia was present on a daily basis from November 5, 1991 until Margo died on December 1, 1991. When the child was cleared, he was released to the care of Sofia D. with the consent of his maternal grandmother, Marjorie C. Although the maternal grandmother subsequently filed a petition for custody, she withdrew her petition in support of guardianship remaining with Sofia. From the time that Astonn was released to her care Sofia provided extraordinary care for Astonn. Upon being advised of his medical needs, Sofia removed carpeting from her home, stopped smoking and made every effort to make their home free of conditions detrimental to his health. She responded to each health crisis that Astonn experienced, rushing him to the hospital emergency room, taking off time from work and going to her home on her lunch hour to insure that he was properly cared for.
The testimony showed that Sofia observed the terms of the temporary order of visitation and expressed a desire for liberal visitation between Adrienne and Astonn. On the other hand, despite Dr. Doyle’s testimony that Astonn had to be in an environment free of dust and mites such as those found in carpeting, Ms. F. did not remove her carpeting for several months. Her inaction prevented visitation in her home and deprived Adrienne of visits with her brother.
The court finds that Ms. F.’s alleged desire to have Adrienne grow up with her half-sibling to be without a basis in fact. While Adrienne has lived with her for several years, she has neither legal custody nor guardianship and at the time of trial had never applied for either. Under the facts here, a grant of Astonn’s custody to Ms. F. would not ensure that the children would grow up together or be in continuing contact. There is no assurance that Adrienne will remain in the physical custody of Ms. F. as there is no legal bar to the child being removed by Derrick F.
Petitioner Derrick F. never wanted custody of this child and admitted such. His marriage in name only to Astonn’s deceased mother does not carry any weight in determining Astonn’s caretaker. While he alleges a desire to have Astonn grow up with his sibling Adrienne, he apparently wants more for Astonn and Adrienne than he does for Adrienne and her two other siblings. Derrick F. has three children including Adrienne, none of whom live together. In fact, Derrick F. has separated two whole siblings as one daughter lives with him and Valerie and one daughter lives with her maternal grandmother. Adrienne lives with Ms. F.
*849 The Child Welfare Administration’s support of Ms. F.’s petition was based on its policy to encourage the award of custody to parties of the same racial, ethnic and cultural background as the child. While this policy may generally be in the best interest of a child, in these proceedings, such policy considerations are outweighed by the facts presented.
No evidence was presented which would support a finding by this court that Ms. F. would be a better caregiver for Astonn. The only person here who has always been a stable, loving presence in Astonn’s life from the time he was born is Sofia D. The maternal grandmother testified that she understood that after Astonn was born, Margo and Sofia would coparent him. Based on all the credible evidence, the court finds it in the best interest of Astonn that guardianship be awarded to petitioner Sofia D. The petition of Derrick F. is dismissed. The petition of Leora F. is granted to the extent of providing for visitation with the half-sibling Adrienne.

. Lambda Legal Defense and Education Fund, Inc., by Paula L. Ettelbrick, Esq. and Suzanne B. Goldberg, Esq., submitted an amicus curiæ brief in support of Sofia D. in these proceedings.

. Petitioner, Sofia D., objected to visitation at the home of Leora F. stating that because of Astonn’s medical condition he would be at risk of respiratory distress. The court granted the F.’s a hearing regarding his condition and any necessary care he needed. The temporary order of visitation was subsequently modified to alternate weekend overnight visitation at the home of Leora F.

. Derrick F. had denied paternity and stated that he was not requesting custody of Astonn. However, his testimony was such that his paternity of Astonn became an issue that the court deemed necessary to resolve. DNA and HLA tests of the child and Derrick F. establish that he is not the father.

. See, petitioner’s exhibit 17, certified copy of marriage certificate.

. The paternal grandfather was not a party to the proceeding.

. This matter is not an adoption, an area where policy considerations are being debated with respect to transracial adoptions. (See, Perry, The Transracial Adoption Controversy: An Analysis of Discourse and Subordination, 21 NYU Rev L & Soc Change 33 [1993-1994].)