DIANA LEE EBIRIM, APPELLEE, V.
LIVINGSTONE C. EBIRIM, APPELLANT.
620 N.W. 2d 117

Filed November 7, 2000. No. A-99-1348.

George B. Achola, of Walentine, O'Toole, McQuillan & Gordon, for appellant.

B. Gail Steen, of Legal Aid Society, Inc., for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

CARLSON, Judge.

## I. INTRODUCTION

Livingstone C. Ebirim appeals from those portions of an order dissolving his marriage to Diana Lee Ebirim in which the court awarded custody of the couple's minor child to Diana and in which it computed his child support obligation. We affirm in part, and in part reverse, and remand for further proceedings.

## II. BACKGROUND

Livingstone and Diana were married in Omaha, Nebraska, on November 7, 1992. One child resulted from that marriage, a son, Chika, born November 9, 1993. Livingstone is a native of Nigeria and a naturalized citizen of the United States, although he retains his Nigerian citizenship. When the couple separated in April 1998, Diana and Chika moved to Diana's father's home in Brownville, Nebraska, where her father owns and operates a foundry. Diana's father's home is a two-bedroom mobile home; Diana and Chika share one bedroom.

Diana filed for divorce on July 16, 1998. The district court entered a temporary order on October 15, awarding temporary custody to Diana, subject to reasonable rights of visitation by Livingstone. That order also provided that Livingstone would pay $300 per month in child support and appointed a guardian ad litem to assess custody issues.

The instant proceedings were held on June 16 and August 2, 1999. Witnesses testifying included both parties and the guardian ad litem, whose report and supplemental report were submitted into evidence, without objection. The guardian ad litem recommended that custody be placed with Diana, with liberal visitation by Livingstone.

The district court filed an order of dissolution on October 22, 1999. With regard to custody, the order provided that "[b]oth parties are fit and proper persons, but it is within the best interests of the minor child that the Petitioner be granted his care, custody and control." Livingstone was granted liberal visitation, including alternate weekends and holidays, extensive summer visitation, and reasonable telephone contact. Livingstone was also ordered to pay child support in the amount of $400 per month. No child support worksheet was attached to the district court order.

The instant appeal was timely filed on November 22, 1999.

## III. ASSIGNMENTS OF ERROR

Livingstone makes two assignments of error: The district court erred in awarding permanent custody to Diana and in failing to show the court's computations for Livingstone's child support obligation.

## IV. STANDARD OF REVIEW

■ In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id.*

■ When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witness and accepted one version of the facts rather than another. *Id.*; *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995).

## V. ANALYSIS

### 1. CUSTODY

■ Livingstone first complains that the district court erred in awarding custody of Chika to Diana. When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990). Thus, in a marital dissolution proceeding,

child custody is denied to an unfit parent or a fit parent when the best interests of the child require such denial of custody. *Id.*

In this case, the court found that both parties were fit parents, a finding neither party disputes. Livingstone, however, asserts that "the scales of determining child custody should have been tipped" in his favor, brief for appellant at 7, for the following reasons: the impact of Chika's biracial heritage upon his social development, the relative qualities of living environments offered by the parties, Diana's admitted past drug abuse, and the educational and employment backgrounds of the parties.

### (a) Chika's Biracial Heritage

■ In arguing that Chika's biracial heritage warrants placement with him, Livingstone asserts that "[f]irst and most importantly [sic], is the fact that [Chika] is . . . of biracial ethnicity." Brief for appellant at 5. Whether biracial heritage plays a role in custody determinations separate from general considerations of best interests of the child does not appear to have been previously addressed by the Nebraska courts. The issue is discussed in Annot., 10 A.L.R.4th 796 et seq. (1981), where the collected cases indicate that it is generally considered as one factor among several in evaluating the best interests of the child. See, e.g., *Farmer v. Farmer*, 109 Misc. 2d 137, 439 N.Y.S.2d 584 (1981) (awarding custody of biracial child to white mother instead of black father). The *Farmer* court explained that the

> father's thesis—that the best interests of this child of an interracial marriage *compel* the award of custody to him because society will perceive her to be black—must be rejected. As between two natural parents of different races who have opted to have a child, neither gains priority for custody by reason of race alone. Nor can race disqualify a natural parent for custody. The course of the child's future life will indeed be affected by her mixed heritage but it may be more severely affected by an inappropriate custody disposition.
>
> . . . Race is not a dominant, controlling or crucial factor. It is to be weighed along with all other material elements of the lives of this family.

(Emphasis supplied.) 109 Misc. 2d at 147, 439 N.Y.S.2d at 589-90. See, also, *Fountaine v. Fountaine*, 9 Ill. App. 2d 482, 486,

133 N.E.2d 532, 534-35 (1956) ("we do not believe that the question of race alone can overweigh all other considerations and be decisive of the question"). We similarly conclude that race is but one factor among several to be considered in custody determinations.

Livingstone contends that Diana's removal of Chika from Omaha, with its relatively large African-American population, to Brownville, which, Diana conceded, has no black children, will be detrimental to Chika because he would be denied daily contact with any racially diverse individuals. Livingstone also asserts, and Diana concedes, that some members of Diana's family have made racial slurs against Livingstone. For her part, Diana asserts that she attempts to expose Chika to biracial and minority children in the greater Brownville area and that he is exposed to minority children during visitations to Omaha. Moreover, Diana's twin sister testified that her family accepts Chika in the same manner as all other grandchildren of the family, an assertion seconded by the guardian ad litem in her supplemental report.

Having considered the impact of Chika's biracial heritage in the light of all the relevant factors, we find no abuse of discretion in that court's implicit conclusion that Chika's biracial heritage should not preclude an otherwise warranted award of custody to Diana.

We find that the same rationale applies to Livingstone's residency argument. It was the district court which heard and weighed the credibility of the witnesses as they addressed this issue, and its determination will be accorded significant deference. We accordingly reject this argument by Livingstone. Compare *Davis v. Davis*, 240 A.D.2d 928, 929, 658 N.Y.S.2d 548, 550 (1997) (affirming custody award of biracial child to white mother over black father and explaining that "the evidence does not support the conclusion that [the child] would be denied his biracial identity, and any concerns in this regard are superficial considering petitioner has been granted liberal visitation").

### (b) Relative Living Environments

Livingstone next asserts that custody would be more appropriate with him because of the relative living conditions offered by

the parties. He points out that at the time of the hearing, Chika and Diana shared one bedroom of a two-bedroom mobile home, with Diana's father occupying the other bedroom. Livingstone asserts, without reference to the record, that he had "indicated in his testimony that he would be willing to offer the child his own separate bedroom in an apartment complex." Brief for appellant at 7.

However, the record shows that at the time of the hearing, Livingstone lived in a one-bedroom apartment, which would have offered, at least initially, the same conditions as offered by Diana. We further note that the guardian ad litem summarized the situation as follows:

> I do agree with Livingstone that Diana's current living conditions are less than ideal. It would certainly [be] better if Chika had his own bedroom or at least his own bed. However, the home was neat and clean and if Diana can get her finances in order it will only be temporary in nature. I do not think that Chika should be removed from Diana's possession simply because her current living situation is less than ideal . . . . Diana seems committed to finding more adequate housing and to returning to Omaha so that Chika can be closer to his father.

In sum, we are not persuaded on these grounds that the district court erred in awarding custody to Diana.

### (c) Drug Abuse

We next address Livingstone's assertion that Diana's admitted past use of illegal drugs suggests that she is unable to provide a stable home environment. Livingstone testified to one episode involving "a marijuana cigarette" in the family residence, at an unspecified time. Diana conceded the incident occurred and testified that it happened approximately 3 years before the instant proceedings. She further testified, without contradiction by Livingstone, that Chika was not present at that time. She also testified that she no longer indulges in any form of illegal substance and that she had not done so for 2 or 3 years. She also testified that Livingstone had indulged in those substances with her at those times.

Those past incidents, although not to be condoned, are of limited weight in a custody determination. See *Hassenstab v.*

*Hassenstab*, 6 Neb. App. 13, 570 N.W.2d 368 (1997) (modification of custody not warranted where alleged suicide attempt had occurred 7 years previously and no showing that alleged alcohol abuse had adversely affected child). The *Hassenstab* court cited *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986), also a case involving custody modification, in which the Supreme Court had made it clear that it is the present situation that is of primary concern.

> "[I]n cases of this nature, it appears to us that in determining . . . custody of a minor child . . . the evidence of the custodial parent's behavior during the year or so before the hearing . . . is of more significance than the behavior prior to that time. What we are interested in is the best interests of the child now and in the immediate future, and how the custodial parent is behaving now is therefore of greater significance than past behavior when attempting to determine the best interests of the child."

*Id.* at 727-28, 380 N.W.2d at 303 (quoting *Riddle v. Riddle*, 221 Neb. 109, 375 N.W.2d 143 (1985)). We similarly conclude that present behavior of the custodial parent is of greater significance than past behavior when attempting to determine the best interests of the child.

(d) Relative Educational and Employment Backgrounds

Finally, Livingstone argues that a comparison of the relative work and educational histories of the two parties suggests that he would be the more appropriate custodial parent. However, these are but two factors among the several to be weighed by the district court in making its custody determination. Moreover, we note that it has long been the policy of this state that economic advantages of a parent do not trump all other factors in determining the best interests of a child. A court cannot deprive a parent of the custody of a child merely because the parent has limited resources or financial problems. *Gomez v. Savage*, 254 Neb. 836, 580 N.W.2d 523 (1998). Accordingly, in light of the trial court's finding that both parties were fit parents, we again conclude, having considered the entire record, that the district court did not abuse its discretion in awarding custody to Diana.

## (e) Conclusion as to Custody

In sum, we find no abuse of discretion in the district court's finding that it was in Chika's best interests that Diana have custody. This conclusion is buttressed by the fact that the guardian ad litem, after talking with the parties and Chika and conducting a home visit to both prospective homes, unequivocally recommended that custody be awarded to Diana. We accordingly reject this assignment of error.

## 2. Child Support Obligation

Livingstone next asserts that the $400 monthly child support obligation set by the district court was arbitrary and unsupported by the record or the Nebraska Child Support Guidelines. We agree.

In general, child support payments should be set according to the Nebraska Child Support Guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 1998). The guidelines provide that in calculating child support, the court must consider the total monthly income, defined as the income of both parties derived from all sources except all means-tested public assistance benefits and payments received for children of prior marriages. *Rhoades v. Rhoades*, 258 Neb. 721, 605 N.W.2d 454 (2000).

In the instant case, the district court apparently based its child support obligation determination on two child support obligation calculations prepared by the parties, which had been submitted to the court and placed in the transcript. Neither was offered into evidence, and neither appears in the bill of exceptions. "A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered." *Huddleson v. Abramson*, 252 Neb. 286, 288, 561 N.W.2d 580, 582 (1997). See, also, *Brierly v. Federated Finance Co.*, 168 Neb. 725, 97 N.W.2d 253 (1959) (affidavit contained in transcript but not preserved in bill of exceptions cannot be considered). Therefore, on this record, there is no *evidence* to support the district court's finding or for this court to review the child support obligation set by the court.

Of more import, we have held that "[p]aragraph C of the Nebraska Child Support Guidelines specifically mandates that

'[a]ll orders for child support, including modifications, *must* include a basic income and support calculation worksheet.' (Emphasis supplied.)" *Laubscher v. Laubscher*, 8 Neb. App. 648, 651, 599 N.W.2d 853, 856 (1999). See, e.g., *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994); *State on behalf of Elsasser v. Fox*, 7 Neb. App. 667, 584 N.W.2d 832 (1998); *Becker v. Becker*, 6 Neb. App. 277, 573 N.W.2d 485 (1997).

We therefore remand this cause to the district court for an evidentiary hearing to determine the amount of child support. We further hold that an income and support calculation worksheet must be attached to the resulting order, as required by the guidelines and case law.

## VI. CONCLUSION

For the reasons set forth above, the district court's custody determination is affirmed. The cause is remanded for an evidentiary hearing to determine the amount of Livingstone's child support obligation.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.