Matter of Baby Doe (2004 NY Slip Op 24247)

Matter of Baby Doe

2004 NY Slip Op 24247 [4 Misc 3d 693]

June 16, 2004

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, September 29, 2004

[*1]
In the Matter of Baby Doe, a Child Alleged to have been Neglected.
Family Court, Kings County, June 16, 2004

APPEARANCES OF COUNSEL

Nathaniel N. Falda and Charles S. Spinardi for Administration for Children's Services. Legal Aid Society (Daniel J. Greenbaum of counsel), Law Guardian.

{**4 Misc 3d at 694} OPINION OF THE COURT

Nora Freeman, J.
Petitioners Mr. and Mrs. Smith[FN1]

filed a custody petition for Baby Doe on April 26, 2004. (Although only Mrs. Smith signed the petition, it was amended in open court on April 28, 2004 to add her husband as copetitioner.) Named as respondents are John and Jane Doe, the unidentified birth parents, and the Commissioner of the Administration for Children's Services (ACS). ACS has had temporary custody of Baby Doe since March 1st when a neglect petition was filed against the parents, alleging that Baby Doe, then about two days old, had been found abandoned in a building hallway on February 24, 2004, and that neither parent had come forward to claim the rights and responsibilities of parenthood.
This court held a fact-finding hearing on April 28 and found that the unidentified parents neglected and abandoned the baby, as defined in Family Court Act § 1012. The court learned on the same day that the Smiths had petitioned for custody. Based on a favorable ACS report indicating that the Smiths, both of whom are New York Police Department (NYPD) sergeants, have a safe home, and have raised their own children satisfactorily, the court granted them temporary visitation and adjourned the dispositional hearing in order to receive additional information regarding Baby Doe's foster home (where she has lived since roughly March 1st) and the Smiths' visitation. Shortly thereafter, ACS moved to dismiss the Smiths' custody petition, arguing that they lacked standing to seek custody of the baby, to whom they are not related and who has never lived with them. (In fact, Mr. Smith had never seen Baby Doe until court-ordered visitation began.) ACS also sought to vacate the order permitting the Smiths to visit.
The court has now reviewed the current case law, the affidavit filed by Mrs. Smith, and the affirmations filed by counsel for ACS, for the Smiths, and the Law Guardian, and concludes, for the reasons stated below, that the Smiths do not have standing either to file for custody or to [*2]intervene at the dispositional phase of the neglect proceeding. Accordingly, the motion is granted, their custody petition is dismissed, and the temporary order of visitation is vacated.
Determination of a "legal stranger's" standing to seek custody is based on extraordinary factual circumstances (see{**4 Misc 3d at 695} Matter of Bennett v Jeffreys, 40 NY2d 543 [1976]). Although the relevant statute, Family Court Act § 651, does not specify who has standing, Bennett makes clear that a "stranger" has standing only if it is shown that the birth parent is unfit, or has abandoned the child, or that similarly "extraordinary" circumstances exist that permit the court to weigh custody in light of the child's best interests. Such circumstances have included the custody petitioners' assumption of physical custody after the death of the birth parent (see Matter of Anonymous v Olson, 112 AD2d 299 [2d Dept 1985]; Matter of Astonn H., 167 Misc 2d 840 [Fam Ct, Kings County 1995]; Matter of Humphrey v Humphrey, 103 Misc 2d 175 [Fam Ct, Steuben County 1980]).
The Smiths argue that the circumstances surrounding Baby Doe are equally compelling. Mrs. Smith states in her petition that she was the NYPD sergeant "on the scene" when the infant was found on February 24th; that she accompanied the baby to the hospital that night and visited her daily until the baby's release to ACS about a week later; and that she placed over 40 telephone calls to ACS and St. Christopher Ottile, the agency supervising the foster home (the agency) in order to learn what steps were necessary for her and her husband to assume custody of the baby and to adopt her. Only after receiving no assistance from ACS or the agency did Mrs. Smith file her custody petition.
Giving the Smiths credit for their sincerity and persistence, it is nonetheless clear that they cannot demonstrate a nexus to Baby Doe by blood or marriage, or by having cared for the child. They are not "relatives" for whom the statute requires an "immediate investigation," pursuant to section 1017 (1); nor are they adult siblings, grandparents, aunts or uncles who may intervene at a dispositional hearing after a finding of neglect (Family Ct Act § 1035 [f]); nor are they foster parents who have acquired a right to be heard by virtue of having cared for the baby (Family Ct Act § 1055 [b] [iii]; § 262 [a] [iv]; Social Services Law § 392 [4] [c]; § 383 [3]). The Legislature has explicitly granted such persons specific rights, including the right to be heard. Family Court Act § 651 (b) is silent as to who may file a custody petition in the Family Court, so courts have looked to the common law for guidance. (See Matter of Luther v Rate, 226 AD2d 803 [3d Dept 1996].) By contrast, guardianship petitions may be filed by "any person" (see SCPA 1703; Family Ct Act § 661; Matter of Dalida P., 204 AD2d 645 [2d Dept 1994]).
It is important to note that the rights of Baby Doe's birth parents have not been terminated. They, like other neglectful parents {**4 Misc 3d at 696}whose children are placed in "temporary" foster care, have statutory, indeed, constitutional, rights to receive information about their child and services to assist them to overcome their past deficiencies and regain custody. They have not yet come forward to claim these rights (and time is running out), but should they wish to do so, their only opportunity is through ACS (or BCW, as it is still known in the community, decades after the Bureau of Child Welfare was reorganized and renamed). If custody were granted to the Smiths, the birth parents would have no means of finding the baby or obtaining help to work toward reunification. Although the possibility for such action lessens with each passing day, the right to family preservation is of such magnitude that it should not be extinguished without due process of law. (See Matter of Jessica F., 7 AD3d 708 [2d Dept 2004] [holding that it is improper to consider a custody request by a nonparent prior to the termination of parental [*3]rights].)
Although unusual, the circumstances of Baby Doe's birth are not unique. In recent years, the number of infants left in bathrooms, hallways and garbage cans has prompted New York City to create a program that allows parents to leave babies in "safe places," such as police precincts and fire departments, with "no questions asked." Babies left at such sitesor, like Baby Doe, in hallwaysare placed in the care of ACS, which has the legal responsibility and the resources to plan for the baby's future. No priority is given to the baby's "finder," or to someone "on the scene." Mrs. Smith claims that she has developed a relationship with the baby by virtue of her daily visits to the hospital. She does not claim, however, that the newborn has developed a bond to her. Mrs. Smith's claims can be matched, even surpassed, by the nurses who cared for the baby for several hours every day. Although the court is sympathetic to the Smiths' credible claim that ACS and the agency were unresponsive to their many calls, the fact remains that Baby Doe needed a foster home immediately, and the Smiths had never before applied for such certification. The Smiths' qualifications to adopt Baby Doe may be superior to those of the foster parents, who are described as "pre-adoptive." The Smiths may have a higher income, a larger home in a better neighborhood, higher education and exemplary parenting abilities. The publicity surrounding adoptions of infants by wealthy celebrities suggests that there are more than a few homes that might be available to babies such as Baby Doe. But it is impractical to suggest {**4 Misc 3d at 697}that whenever ACS assumes custody of a foundling it should invite "any persons with exemplary qualifications" to submit applications to adopt the child. Persons interested in becoming foster parents or adoptive parents have the opportunity to do so. It appears the Smiths did not have such a desire until "that fateful day" (as Mrs. Smith described it in her May 14, 2004 affidavit) when Baby Doe was found.
"Fate" or luck should not be the factor elevating a legal stranger's status to one with standing to pursue adoption of an abandoned, dependant child. Although an extraordinary event may appear to an individual as "fate," it is not a concept generally recognized in law. For example, when a mix-up of embryos implanted by a fertility clinic in the "wrong" (that is, nonbiological) mothers resulted in two women giving birth to babies that were not their own, one set of parents sought ongoing visitation between themselves, their own infant, and the baby that the mother had carried for nine months. Despite the obvious and sincere emotional bond felt by the couple, the appellate court ruled that the "happenstance of . . . nominal parenthood" was insufficient to create standing to such visitation. (Perry-Rogers v Fasano, 276 AD2d 67, 74 [lst Dept 2000], lv denied 96 NY2d 712 [2001].) The Smiths' claim of a nexus to Baby Doe, sufficient to give them standing to pursue custody, or a "priority" to become foster parents, is similarly unavailing.
This court is mindful of the strong feelings of the foster parents and the Smiths, of the importance of foster parent training and supervision, and above all, of the need to minimize harm to Baby Doe and give her the best opportunity to find a safe, permanent, loving home. One might argue that, in a close case, the preferable course is to afford the baby the widest range of options, in other words, to hold a full evidentiary hearing to determine whether the Smiths or the (anonymous) foster parents offer her the best home. Such a course, however, would undermine necessary restrictions on standing, has the potential to create administrative chaos for ACS and its agencies, and, worst of all, would delay permanency for Baby Doe. In reality, custody [*4]hearings in the New York City Family Court frequently take months to complete. Counsel zealously advocating for their clients would wish to make the most complete record, calling numerous witnesses and doubtless seeking forensic evidence regarding the four-month-old baby's level of attachment to her foster parents. To schedule such a hearing, accommodating trial calendars, {**4 Misc 3d at 698}attorneys and expert witnesses, would leave Baby Doe's future in doubt for months.[FN2]

For the reasons cited, this court believes the correct decision is to grant the motion to dismiss the Smiths' custody petition, to conclude the dispositional hearing in the neglect case, and to order the foster care agency to file a petition to terminate parental rights as soon as a cause of action ripens. Nevertheless, recognizing the unique set of facts before it, and having found no case directly on point, the court stays the dismissal order until 5:00 p.m. on June 23rd, in order to permit the Smiths to seek appellate review.

Footnotes

Footnote 1: Petitioners' names are fictitious for purposes of publication.

Footnote 2: Family Court is not organized to permit trials to be conducted for several consecutive days. No judges are assigned to preside only over trials. Instead the judge's daily calendar includes return of process, discovery and settlement conferences, pretrial hearings and trialsall of which must be scheduled to allow for the regular "intake" assignments for the judge and institutional lawyers at ACS and the Legal Aid Society. Thus, a custody trial would likely be scheduled for two-hour installments over a period of several weeks. Many judges, including the undersigned, are now scheduling "trial time" in September.